# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00217-CV

**David Hayes, M.D.; Robert Morrison, M.D.; Philip Ralidis, M.D.; Jordan Weingarten, M.D.; Maro Ohanian, D.O.; Lindsay Coull, R.N.; Leah Delafield, R.N.; Kristi Donau, R.N.; Nathan Lofgren, R.N.; Karla McKinney, R.N.; Melissa Migl, R.N.; Sooncha Sherman, R.N.; Shonna Tobias, R.N.; and Katie Watson, R.N., Appellants**

**v.**

**Janet Carroll, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-07-001367, HONORABLE GUS J. STRAUSS JR., JUDGE PRESIDING**

---

## O P I N I O N

This appeal presents issues arising from the expert report requirements of civil practice and remedies code section 74.351. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2009). Appellants—all of them physicians or nurses—appealed the trial court's order denying their motions to dismiss appellee Janet Carroll's health care liability claims for failure to timely serve an expert report. *See id.* § 74.351(b). We affirm the trial court's order.

### Factual and Procedural Background

In September 2006, Carroll was found unconscious at her home and was transported by ambulance to Brackenridge Hospital for treatment. During her initial treatment, emergency medical responders placed a bandage just below Carroll's right knee to secure a needle inserted to supply intravenous fluids. Once at the hospital, Carroll underwent treatment at

the cardiac catheterization lab and was transferred to the intensive care unit. Carroll was treated by a number of physicians and nurses at Brackenridge. Approximately 28 hours after arriving at the emergency room, one of her attending nurses noticed swelling around the bandage below her right knee. The bandage was removed and the area was monitored. Ultimately, however, due to necrosis of the skin, muscle, and tendons of Carroll's right leg below the knee, surgeons determined that amputation of that leg was required. The surgeon's notes reported that the necrosis was "secondary to a tourniquet-like effect" of the bandage applied by emergency responders attempting to resuscitate Carroll. In her health care liability claim, Carroll alleges that while she was unconscious and in shock, she received over ten liters of intravenous fluids that caused her to gain approximately 20 pounds in less than 24 hours. She asserts that during this time, no physician or health care provider checked, loosened, or removed the bandage on her right leg. Carroll alleges that, over time, the unattended bandage began to act as a tourniquet, cutting off circulation to her leg and causing irreversible injury that ultimately required amputation. Carroll alleges that her injury resulted from the failure of each appellant to notice, document, check, loosen, or remove the bandage in time to prevent the loss of her leg.

Carroll initially filed suit on May 8, 2007, asserting a health care liability claim against Seton Healthcare Network as operator of Brackenridge Hospital. Carroll attached to this pleading the expert reports of Don Patman, M.D. and Theresa Posani, R.N. After the district court sustained Seton's objections to the sufficiency of those reports, Carroll served Seton with supplemental reports from both Patman and Posani in July 2007. On October 30, 2007, Carroll filed an amended petition in which she first named as defendants and asserted health care liability claims against physicians David Hayes, Robert Morrison, Maro Ohanian, Philip Ralidis, and

2

Jordan Weingarten and nurses Lindsay Coull, Leah Delafield, Kristi Donau, Nathan Lofgren, Karla McKinney, Melissa Migl, Sooncha Sherman, Shonna Tobias, and Katie Watson. Carroll attached new reports prepared by Patman and Posani to the amended petition. In January 2008, Carroll served defendants with a fourth report prepared by Patman.

Appellants timely filed objections to the sufficiency of the expert reports. *See id*. § 74.351(a) (physician or health care provider whose conduct is implicated in report must file and serve any objection to sufficiency of report not later than 21st day after date it was served). Certain of the appellants asserted that Carroll did not serve them with expert reports within the time period specified by section 74.351(a). *See id.* (requiring service of expert reports "not later than the 120th day after the date the original petition was filed"). They argued that the time period for serving expert reports expired on September 5, 2007, 120 days after Carroll filed her "original petition" asserting a health care liability claim against Seton, even though they were not named as defendants and had no health care liability claims asserted against them until October 30, 2007. Several of the appellants also contended that Patman and Posani failed to demonstrate that they were "experts" qualified to render opinions concerning the applicable standards of care. *See id.* §§ 74.351(r)(5), .401 (West 2005) (qualifications for expert witness in suit against physician), 74.402 (West 2005) (qualifications for expert witness in suit against health care provider). All of the appellants objected to Patman's fourth report and Posani's third report on the ground that they failed to satisfy the statutory definition of an "expert report" by failing to provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by each defendant failed to meet the applicable standards, and the causal relationship between such failure and Carroll's

3

injury. *See id.* § 74.351(a), (*l*), (r)(6). The district court overruled all of appellants' objections to the expert reports.

Appellants then moved to dismiss Carroll's health care liability claims under section 74.351(b) of the civil practice and remedies code. *See id.* § 74.351(b) (court shall dismiss health care liability claims against defendant physicians or health care providers who have not been timely served with an expert report); *Bogar v. Esparza*, 257 S.W.3d 354, 359-60 (Tex. App.—Austin 2008, no pet.) (plaintiff may fail to serve expert report within specified time period not only by failing to serve any expert report (an "absent" report) within statutory deadline but also by providing within the deadline a report that does not satisfy statutory requirements (a "deficient" report)). The trial court denied the motions to dismiss, and this appeal followed.[1]

**Timeliness of Service**

We first consider whether Carroll served Patman's fourth report and Posani's third report within the time period required by the statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The controlling statute is the current version of 74.351(a), which provides in pertinent part:

> In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or

---

[1] While this interlocutory appeal was pending, the trial court granted a motion for summary judgment filed by nurses Delafield, Donau, Lofgren, McKinney, Migl, Sherman, Tobias, and Watson. Carroll's claims against these defendants were severed out and assigned a new cause number, resulting in a final order dismissing Carroll's claims against these defendants. The district court also granted Carroll's motion to nonsuit her claims against physician Hayes. Consequently, Hayes, Delafield, Donau, Lofgren, McKinney, Migl, Sherman, Tobias, and Watson are no longer parties to this appeal.

4

> more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.

*Id.* Coull, Ohanian, and Ralidis contend that the term "original petition" means the first pleading filed by the plaintiff in a lawsuit, in this case the pleading Carroll filed on May 8, 2007, asserting a health care liability claim against Seton. That filing, they argue, triggered the 120-day period for serving expert reports on every defendant, whether named in the first pleading filed or added by amendment later. Coull, Ohanian, and Ralidis assert that Carroll was required to serve them with expert reports on or before September 5, 2007, despite the fact that she had not yet asserted a health care liability claim against them.[2] Carroll counters that the 120-day time period for serving these defendants with an expert report commenced on October 30, 2007, the date she first asserted health care liability claims against them in her first amended petition. We agree with Carroll.

In construing a statute, our objective is to determine and give effect to the legislature's intent as expressed by the language of the statute. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We use definitions prescribed by the legislature and any technical or particular meaning the words have acquired, but otherwise, we construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context, or unless such a construction leads to nonsensical or absurd results. *FKM P'ship, Ltd. v. Board of Regents of Univ. of Houston Sys.*, 255 S.W.3d 619, 633 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005). We presume the legislature intended a just and reasonable result by enacting the statute. Tex. Gov't Code Ann. § 311.021(3) (West 2005). We may consider the object the

---

[2] Morrison and Weingarten do not join in this argument.

5

legislature sought to obtain, the legislative history, and the consequences of a particular construction. *See id.* § 311.023(1), (3), (5) (West 2005). Our analysis of the statutory text is also informed by the presumption that "the entire statute is intended to be effective." *Id.* § 311.021(2).

Reading section 74.351(a)'s requirement that reports be served within 120 days of the filing of the "original petition" as applying exclusively to the first pleading filed by a claimant in a health care liability suit regardless of whom that pleading makes a health care liability claim against (i.e., names as a defendant) runs into a number of interpretational and logical problems. As a starting point we note that section 74.351(a)'s use of the term "original petition" does not indicate whether it was intended to mean the original petition "filed in a particular cause number" (the first document filed as a "petition" in a case) or the original petition "filed against a particular defendant" (the first document initiating a suit against a defendant). Either construction must be derived from something other than the literal language of the statute. Fortunately, there is guidance from the legislative history of section 74.351(a) that sheds some light on the legislature's intent in amending this section to use the term "original petition." The bill analyses prepared by both the House and Senate committees that handled the amendment to section 74.351(a) in 2005 that added the term "original petition" stated the purpose of the amendment as follows:[3]

> Since the passage of [H.B. 4 in the 78th Legislature], there has been some confusion regarding the timing of when an expert report is due on a medical malpractice case. Some have argued that the report is due 120 days from the date of the statutory notice letter, instead of 120 days from the date of the filing of the original petition. It was the intent of H.B. 4 that the report be triggered by the filing of the lawsuit.

---

[3] The current version of the statute is the result of a legislative amendment in 2005 whereby the legislature substituted the phrase "the date the original petition was filed" for the phrase "the date the claim was filed." Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590.

House Comm. on Civil Practices, Tex. H.B. 2645, 78th Leg., R.S. (2005); Sen. Comm. on State Affairs, Tex. H.B. 2645, 78th Leg., R.S. (2005).

Two things are notable from the bill analyses. First, the primary purpose of the amendment was to clarify that the 120-day report deadline did not run from the date of the statutory notice letter. Second, the analyses specifically note that the intent of the statute creating the 120-day deadline was to have the deadline "triggered by the filing of the lawsuit." This is an indication that the amendment was intended to make the filing of a lawsuit the demarcation event for starting the 120-day report deadline. If a defendant has not been added to a case, there has yet to be a lawsuit filed against that defendant. Even if the lawsuit against a particular defendant comes in the 10th amended petition filed in a cause number, that petition is the first document in which a lawsuit has been filed against that defendant. Regardless how that document is styled, it is the original or first petition bringing a lawsuit as to that defendant. Thus, a construction of section 74.351(a) that interprets the term "original petition" as being the first document filed in a case that brings a claim against a defendant or constitutes the filing of a lawsuit against a defendant is consistent with the available legislative history on the issue.

In addition, interpreting the term "original petition" to refer to the first petition in a cause number regardless of who is named as a defendant in that petition generates an untenable practical problem. If the 120-day deadline runs from the filing of the first petition in a case regardless of who is named as a defendant, a plaintiff could never add another physician or health care provider as a defendant beyond 120 days of the filing because the plaintiff would never be able to serve an expert report as to that defendant in a timely fashion. This would effectively function as a de facto statute of limitations or statute of repose on any further claims against unjoined

7

parties even if the claims against those parties are unknown or undiscoverable at the time of the filing of the initial petition against known defendants. This would be a major change in the law relating to limitations on claims. It would also create the potential for unreasonable or unjust results in cases where a plaintiff has no reason to know of viable claims against a party until more than 120 days has run from the filing of claims against other parties. We do not think the legislature would have intended to make such a major change to the law with respect to limitations on health care liability claims in such an obscure manner. Nor do we think the legislature would have intended a construction of the expert report provisions of the statute to produce the harsh result of extinguishing unknown claims that are still within applicable limitations periods without a more clear statement of intent to do so.[4]

We construe section 74.351(a) to require that a health care liability claimant must serve an expert report on a physician or health care provider not later than the 120th day after the date the claimant files the pleading that first asserts a health care liability claim against that physician or health care provider.[5] The title of the pleading is not dispositive in the sense that an "original"

---

[4] A corollary to this problem is that it could produce an incentive to engage in unnecessary and costly procedural machinations not addressed in the statute to avoid losing a claim. For example, one wonders if a claimant who discovers new claims against new defendants beyond the 120-day expert report period might file a separate lawsuit in a different cause number against the new defendants—thus creating a new "original petition" and a separate 120-day report period. The plaintiff might then seek to consolidate the cases for discovery and trial. Such potential procedural maneuvers highlight the unlikelihood that the legislature intended its amendment of section 74.351(a) to limit the term "original petition" to mean only the first filed document in a cause number relating to a health care liability claim. If the legislature had intended such a construction, it would not have done so without any consideration of or provision for procedural devices that might effectively nullify the measure.

[5] This holding is applicable to situations—such as this case—where the claims in question remain pending during the entirety of the relevant 120-day period. The question of how the 120-day

8

petition in a case is operative for the purposes of the deadline and an "amended" petition is not. Rather, the substance of the petition with respect to the health care providers who are named as defendants is dispositive. If the pleading is the first pleading naming a defendant, it is the "original" petition as to that defendant regardless of its title, and the 120-day expert report deadline is triggered by that filing as to that defendant.

Our interpretation of the amended section 74.351(a) is consistent with the approach taken by the other two Texas appellate courts to confront the issue. The San Antonio court of appeals held in *Osonma v. Smith* that the operative pleading for purposes of triggering the 120-day report deadline for a defendant was the pleading first naming that defendant as a party. No. 04-08-00841-CV, 2009 Tex. App. LEXIS 4959, at *4 (Tex. App.—San Antonio July 1, 2009, pet. denied) (mem. op.). Less than a year later, the Corpus Christi court of appeals followed the San Antonio court's approach in *Padre Behavioral Health System, LLC v. Chaney*, No. 13-09-00495-CV, 2010 Tex. App. LEXIS 1783, at *14-19 (Tex. App.—Corpus Christi Mar. 11, 2010, no pet. h.). We agree with the conclusion regarding the proper construction of section 74.351(a) in these cases.

Our interpretation is also consistent with case law addressing the issue under the version of the statute in effect before 2005. *See Poland v. Grigore*, 249 S.W.3d 607, 613-14 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (under former version of section 74.351, time period to serve expert report on physician was triggered by filing of first amended petition, which was first petition to contain health care liability claim against that physician); *Poland v. Ott*, No. 01-07-

---

deadline applies in a situation involving a nonsuit of claims prior to the expiration of the 120-day period, and whether tolling may or may not apply in such a situation, is not presented in this case. We express no opinion as to that issue.

00199-CV, 2009 Tex. App. LEXIS 3766, at *17-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (mem. op.) (providing expert report before health care liability claim is filed in court against physician or health care provider does not meet former 74.351(a)'s service requirement). Coull, Ohanian, and Ralidis contend these cases are not relevant because they involve construction of the previous version of section 74.351(a), and that the 2005 amendment "effectively changed the law." The Texas Supreme Court has, however, rejected the argument that the amendment to the statute changed its meaning. *See Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008) ("[W]e see nothing in the slight change in the statute's language to indicate that a different meaning was intended."). Furthermore, the legislative history indicates that the amendment was intended to clarify that the statutory notice letter *did not* trigger the 120-day reporting period and the period was triggered by the filing of a petition in court. No mention is made in the legislative history that the legislature was intending to create a significant substantive change to the law on when health care liability claims are extinguished. *See* House Comm. on Civil Practices, Tex. H.B. 2645, 78th Leg., R.S. (2005); Sen. Comm. on State Affairs, Tex. H.B. 2645, 78th Leg., R.S. (2005).

In the present case, the event that triggered the deadline for serving appellants with the expert reports at issue in this case was the first pleading filed by Carroll stating claims against appellants on October 30, 2007. Consequently, Patman's fourth and Posani's third reports were timely served.

### *Sufficiency of Expert Reports*

Under section 74.351(r)(6), the expert report must provide a fair summary of the expert's opinions regarding the applicable standards of care, the manner in which the care rendered

by the defendant physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of an "expert report" in the statute. *Id.* § 74.351(*l*). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the district court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *American Transitional Care Ctrs., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)).

The report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements defined in section 74.351. *Palacios*, 46 S.W.3d at 878; *Constancio v. Bray*, 266 S.W.3d 149, 155 (Tex. App.—Austin 2008, no pet.). A report cannot merely state the expert's conclusions about the statutory element. *Palacios*, 46 S.W.3d at 879; *Constancio*, 266 S.W.3d at 155. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). In addition, because the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios*, 46 S.W.3d at 878. The court may not fill gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Constancio*, 266 S.W.3d at 155; *Austin Heart P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.).

We review a trial court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios*, 46 S.W.3d at 877-78; *Constancio*, 266 S.W.3d at 155. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 242. However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

Appellants contend that the reports are insufficient in several respects to meet the requirements for an expert report under section 74.351(a). They challenge Patman's and Posani's qualifications as "experts." They also contend that the reports are inadequate because (1) they fail to state a standard of care for each physician or nurse, (2) they fail to show how each physician or nurse breached the standard of care applicable to him or her, and (3) they fail to show how each alleged breach was the proximate cause of Carroll's injury.

*Expert Qualifications*

Ralidis, an emergency medicine specialist, Weingarten, a pulmonologist, Morrison, a critical care physician, and Coull, an intensive care unit nurse, each contend that Patman has no training, certification, or experience in their particular medical specialty and is, therefore, not qualified to give an opinion on the particular standard of care applicable to them. However, a physician need not be a practitioner in the same specialty as the defendant to be a qualified expert

12

in a particular case. *See Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996); *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (if subject matter is common to and equally developed in all fields of practice, any physician familiar with subject may testify as to standard of care).

Under the Texas Rules of Evidence, the test is whether the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court. Tex. R. Evid. 702; *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (inquiry is whether proposed expert is qualified to give opinion on particular subject before court). Whether a physician qualifies as an expert is determined by comparing the area in which the witness has such knowledge, skill, experience, or training with the subject matter of the proposed testimony. The focus is on the "fit" between the subject matter at issue and the expert's familiarity of the subject matter, and not on a comparison of the expert's specialty or experience with that of the defendant. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2) (West 2005) (requiring expert to have knowledge of accepted standards of care related to illness, injury, or condition involved in claim); *Blan*, 7 S.W.3d at 745 (general surgeon qualified to testify regarding standard of care for post-operative procedures performed by gynecologist because post-operative procedures are common to both fields) (citing *Simpson v. Glenn*, 537 S.W.2d 114, 116 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.)). If the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. *Id.*

In the present case, Carroll contends that the physicians and nurses who participated in her care were negligent in the basic care of a patient who was not conscious and that, as a result, the bandage placed on her leg during emergency treatment was not detected, loosened, or removed

13

in time to prevent the damage to her leg that required amputation. Carroll does not complain about the manner in which any of the physicians or nurses carried out particular specialized medical procedures, and Patman's report does not address the standard of care required when providing specialized medical services such as cardiac catheterization. The test, then, is whether Patman is qualified to provide expert testimony regarding the standard of care applicable to "the condition involved in the claim," which in this case is a bandage placed by an emergency responder on the leg of a patient in an unconscious, semicomatose, or altered mental state and left unadjusted such that it allegedly caused an unnecessary amputation of the leg.

Patman has been a licensed medical doctor since 1958. He is a practicing physician and general and vascular surgeon and is board certified in general surgery and general vascular surgery. Patman's report states that, through his medical training and his years of practice, he is familiar with the appropriate standard of care applicable to physicians and nurses, regardless of their specialization, when providing medical services to a patient in circumstances such as those alleged in this case. He further states that this standard of care is "a basic medical skill" learned by all physicians and nurses as part of their basic medical training, and is required of all physicians and nurses regardless of whether they receive additional or advanced training.

Appellants do not challenge Patman's qualifications as a vascular surgeon, nor do they contend that he does not know how to care for a patient in Carroll's alleged condition. Rather, they argue that he may not opine regarding the standard of care as applied to their various specialties. This argument ignores the plain language of the statute, which focuses not on the defendant doctor's area of specialty, but on the medical condition involved in the claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2). The argument that Patman is unqualified to give an opinion because he

does not know the standard of care applicable to emergency room physicians or pulmonologists would be persuasive if he were purporting to offer expert medical opinions in matters peculiar to the fields of emergency medicine or pulmonology. However, he is not. His report states that the standard of care he describes applies to any physician or nurse treating an unconscious or semicomatose patient regardless of the physician's or nurse's area of expertise. We hold that the trial court did not abuse its discretion in finding that Patman's medical training and experience gained through years of practice as a vascular surgeon qualified him to provide expert testimony regarding the standard of care required of a physician or nurse whose patient is unconscious or in an impaired or altered mental state with an allegedly blood-flow-constricting bandage applied to a leg.

We also reject Coull's contention that Posani is not qualified to give an opinion regarding the standard of care that applies to an intensive care unit nurse. Posani's report states that she is a certified as a critical care registered nurse and clinical nurse specialist in adult health (medical-surgical) nursing. Her curriculum vitae indicates that she has been a registered nurse since 1975 and has significant experience as an intensive care unit nurse. She states that through her training and experience she has knowledge of the accepted standard of care applicable to a nurse working in the intensive care unit with an unconscious patient with health issues such as diabetes, intraosseous catheters, and potential circulation problems. Posani's opinions are directed to the treatment that should be provided to such a patient by any nurse regardless of whether they are working in the emergency room, the intensive care unit, or the cardiac catheterization lab. Her opinions do not relate to techniques, decisions, or skills unique to a particular nursing specialization. The trial court did not abuse its discretion in concluding that Posani was qualified to give an opinion regarding the standard of care applicable to the nurses involved in Carroll's care.

15

*Standard of Care*

All appellants argue that Patman's expert report is deficient because it does not set out a separate standard of care for each particular physician or nurse and fails to explain how each individual physician or nurse breached that standard of care. *See Kettle v. Baylor Med. Ctr.*, 232 S.W.3d 832, 839 (Tex. App.—Dallas 2007, pet. denied) (generalized statement without explanation that a uniform standard applies can reasonably be deemed conclusory and deficient). In this case, however, Patman's report does explain that a uniform standard of care applies to all physicians and nurses participating in Carroll's care. Patman opines:

> The applicable standard of care for nurses (including E.R. and ICU nurses) and physicians (including E.R., internal/attending physicians, and consulting physicians) charged with the care, surveillance and treatment of patients who are unconscious, semicomatose or with other significant altered mental states is very basic and thus the same for all nurses and physicians involved with such patients.

Patman's report then describes what that standard of care is: "the standard of care requires both the nurses and physicians involved in this case to assess, monitor, and document the patient's condition, particularly including the patient's skin condition, and most particularly for this case, those portions of the body with dressings of any kind." The report expands on the standard of care by stating that "circumferential extremity pressure bandages are to be examined for drainage, comfort, proper fit, as well as preventing such a bandage from becoming too constrictive and causing circulatory impairment to the distal portion of the extremity of either a venous or arterial nature, or both."

Because the report affirmatively states that a uniform standard of care applies to each physician and nurse, and identifies what the standard of care is, Patman's report is sufficient to provide a fair summary to each physician and nurse of his opinion regarding the standard of care

16

applicable to each. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (expert report means written report that, among other things, provides summary of expert's opinion regarding applicable standards of care); *Romero v. Lieberman*, 232 S.W.3d 385, 391-92 (Tex. App.—Dallas 2007, no pet.) (applying same standard of care for all physicians participating in treatment of patient as to recognition and treatment of symptoms of septic shock); *In re Stacy K. Boone*, 223 S.W.3d 398, 405-06 (Tex. App.—Amarillo 2006, orig. proceeding) (discussing standard of care applicable to all defendants involved in administration of treatment).

With regard to the manner in which the care rendered by the physicians and nurses failed to meet the standard, Patman names each individual physician and nurse and states that each "completely failed to: document the presence of the constrictive bandage; examine, assess, monitor and document the condition of the covered area; recognize and document the potential hazard of such a bandage and include the care and vigilance of the area in the comprehensive treatment of Ms. Carroll." In Patman's opinion, these failures by each physician and nurse named represented a "marked departure in the applicable standard of basic care for each and every one." The report plainly states that each of these physicians and nurses participating in Carroll's care did not take note of the presence of the bandage on Carroll's leg and, consequently, did not observe or monitor the effect of the bandage throughout her treatment. The report provides a fair summary of Patman's opinion regarding how each physician and nurse failed, in the same manner, to meet the uniform standard of care. We hold that the trial court did not abuse its discretion when it denied appellants' motions to dismiss based on their complaints that Carroll's expert reports were deficient as to the statement of the standard of care and alleged breach of the standard by the defendants.

17

Coull challenges Posani's report on similar grounds, contending that Posani failed to articulate the applicable standard of care for each nurse. However, because we have determined that Patman's report meets the statutory requirements on the issues of the standard of care and failure to meet that standard as to each appellant, we need not address complaints regarding the sufficiency of Posani's report on these issues. *See* Tex. R. App. P. 47.1.

*Causation*

Appellants also argue that Patman's report is deficient because it does not provide a fair summary of his opinions regarding causation as to each appellant. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). Appellants contend that Patman's report collectively addresses causation and that Patman fails to link his causation opinions to specific conduct of each Appellant. They argue that his collective opinion as to causation is inadequate and that he is required to render an opinion as to causation by each appellant in a more specific manner.

Patman's report states that each doctor and nurse failed to detect and document the presence of the bandage on Carroll's leg, and that each doctor and nurse failed to assess and monitor the condition of her bandaged leg or examine the "circumferential extremity pressure dressing" for "drainage, comfort, proper fit, as well as preventing such a bandage from becoming too constrictive and causing circulatory impairment to the distal portion of the extremity." Patman's report explains:

> The purpose of such checks and documentation is to (1) ensure that the bandage is not too tight and constricting circulation to the leg, so that compartment syndrome does not develop in the leg, and (2) to alert personnel checking the patient in the future of a potential problem area that needs monitoring. Both are critical.

18

This explanation of the applicable standard of care and why adhering to it is required provides sufficient information to explain how breaching that standard caused Carroll's injury. Patman links breach of the standard of care with the injury in his opinion regarding causation:

> It is therefore my opinion, based upon reasonable medical probability, that each of the physicians and the nurses listed above, who were charged with the care of Ms. Carroll (who remained in a comatose state), breached the applicable standard of care by failing to document the existence of the dressing, inspect the dressing, monitor the dressing and evaluate the condition of the distal extremity from 09/01/06 to . . . 09/02/06. As a consequence, circulation to the extremity was compromised, the extremity's condition went unmonitored, and the impediment to circulation was not removed until after the damage was done. Such actions caused irreversible ischemia of the right lower extremity with resultant amputation.

Patman opines that each physician's and nurse's individual failure to notice the presence of the bandage and monitor the effect it had on Carroll's leg caused the bandage and its effects to go undetected, which caused the damage requiring amputation of her leg. Moreover, Patman's report includes his opinion regarding what the proper course of action for each physician and nurse would have been—to notice the bandage, make sure it was not too tight, and loosen or remove it if it was. He also states that each physician and nurse should have documented the presence of the bandage to ensure that subsequent caregivers would do the same. Patman's report notifies each appellant that, in his opinion, each of them is responsible for the harm caused by the constrictive bandage because none of them noticed, loosened, or removed it.

The expert report is not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints. *Apodaca v. Russo*, 228 S.W.3d 252, 255 (Tex. App.—Austin 2007, no pet.). It may be that the trier of fact ultimately rejects Patman's opinion regarding causation and determines that the damage caused by the bandage

became irreversible at a point prior to the involvement of one or more of the appellants in Carroll's care, such that his or her failure to intervene did not proximately cause the harm. At this stage of the case, however, Carroll is not required to marshal all of her evidence or prove her case against a particular defendant. Rather, what the statute requires is that the report constitute a good faith effort to provide a fair summary of the expert's *opinions* regarding causation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c)(6). The "good faith effort" requirement is met if the report provides enough information to (1) inform the defendant of the specific conduct the plaintiff calls into question and (2) provide a basis for the trial court to conclude that the claims have merit. *American Transitional Care Ctrs.*, 46 S.W.3d at 879. Patman's report sufficiently informs each defendant in this case of the specific conduct he believes was deficient and what conduct on the part of each defendant caused injury to Carroll. Keeping in mind that expert reports such as Patman's are simply a method to show, at an early stage in the litigation, that a plaintiff has a viable cause of action that is not frivolous or without expert support, we hold the trial court did not abuse its discretion when it denied appellants' motion to dismiss on the ground that Patman's report was deficient as to causation.[6]

***Conclusion***

Patman's fourth and Posani's third reports were served on appellants within 120 days of the date Carroll first asserted a health care liability claim against them in court and were timely. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The trial court did not abuse its discretion by

---

[6] Coull also challenges Posani's qualifications to provide opinions regarding medical causation. Carroll concedes that Posani is not so qualified and states that her report was not offered for the purpose of addressing causation. Consequently, we do not address complaints regarding the sufficiency of Posani's report in this regard.

concluding that Patman's fourth report represents an objective, good faith effort to comply with the definition of an expert report provided in section 74.351(r)(6). *See id.* § 74.351(r)(6). The trial court's order denying appellants' motions to dismiss is affirmed.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed: May 14, 2010