Opinion issued October 21, 2010.

 

 



In
The

Court of
Appeals

For
The

First District
of Texas

————————————

NO. 01-10-00270-CV

———————————

Doctors hospital, Doctors Hospital, 1997, L.P., individually
and D/B/A doctors Hospital and Tidwell Parkway Ventures, LLC, Individually and
D/B/A Doctors Hospital, and DENITRIA PRICE, Appellants

V.

Santos Hernandez,
Individually and as Representative of the Estate of Cynthia Hernandez,
deceased, and as next friend of Josselyn Naomi Hernandez, a minor, Appellee



 



 

On Appeal from the 164th
District Court

Harris County, Texas



Trial Court Case No. 2009-50669

 



 

 

 

MEMORANDUM
OPINION

 

          In this interlocutory appeal,
appellants, Doctors Hospital, Doctors Hospital, 1997, L.P., individually
and d/b/a Doctors Hospital, Tidwell Parkway Ventures, LLC, individually and d/b/a
Doctors Hospital (collectively, “Doctors Hospital”), and Denitria Price, challenge
the trial court’s order denying their motion to dismiss the heath care
liability claim of appellee, Santos Hernandez, individually and as
representative of the estate of Cynthia Hernandez, deceased, and as next friend
of Josselyn Naomi Hernandez, a minor.  Doctors Hospital and Price contend the expert
report submitted by the Hernandezes is inadequate and the trial court erred by
failing to dismiss the Hernandezes’ suit. 
We hold the trial court did not abuse its discretion by not dismissing the
Hernandezes’ suit.  We affirm.

Background

          Cynthia
Hernandez was admitted to Doctors Hospital on August 26, 2007 for a planned,
elective, non-emergency inducement of labor. 
She was 41 weeks and 4 days pregnant and was overdue for delivery, which
should have
occurred around August 18, 2007.  She was
a Jehovah’s
Witness and had an advance directive against blood transfusion, but her 2006 medical
power of attorney said that she would consider the use of blood fractions upon later
discussion.  Mrs. Hernandez was given a
labor-inducing drug at 2:00 p.m. on August
27.  Price, a labor and delivery nurse,
established a relationship with Mrs. Hernandez at 7:45
p.m., when she was assigned to care for her during the inducement process.  The labor progressed slowly, with
complications, and, at 9:45 p.m., Dr. Piegari made the
decision to perform a caesarean section. 

          The surgical
team, including Dr. Piegari, Price, and Certified Registered Nurse Anesthetist
D. Arrington, assembled within thirty minutes, and Mrs. Hernandez was taken
to the operating room.  The surgery,
which was performed under local anesthesia, began at 10:44 p.m.  A baby girl weighing 10 pounds, 1
ounce, Josselyn Naomi Hernandez, was delivered. 
At 11:18 p.m., the surgery complete, Mrs. Hernandez was transferred to
the Post Anesthesia Care
Unit (“PACU”).

          Price resumed
caring for Mrs. Hernandez in the PACU.  Arrington,
who administered the local anesthetic during surgery, signed papers discharging
Mrs. Hernandez from PACU at 11:29 p.m. 
While Ms. Hernandez was in the PACU, Price documented 200 milliliters of
blood tinged urine in Mrs. Hernandez’s Foley catheter bag.  Additionally, Mrs. Hernandez’s
pre-surgery blood pressure was 118/74 with a pulse of 84,
while her PACU blood pressure and pulse were 98/52 and 100.  These were indications of internal bleeding.  Price did not notify Dr. Piegari of these indications.  Price made several entries in the
medical records noting “dark red blood via Foley”
and “scant vaginal
blood loss,”
but then said there was “no active bleeding noted.”


          Mrs. Hernandez
was transferred from the PACU to a regular floor room and was assigned
to the care of another registered nurse, In Clemado.  On the floor, her blood
pressure at 1:20 a.m. was 98/52 with a pulse of 102.  Clemado, like Price, did not notify Dr.
Piegari about this hemodynamic instability. 
By 2:10
a.m., Mrs. Hernandez’s vital signs were continuing to deteriorate,
with a blood pressure
of 75/50 and a pulse of 111.  At 2:20
a.m., when blood pressure was 68/48, Clemado finally
called Dr. Piegari.

          Mrs. Hernandez
was transferred back to the Labor and Delivery Department at 2:40
a.m., where she was again placed under the care of Price.  Dr. Piegari arrived back at the hospital and summoned the operating team,
consisting of an additional assistant surgeon and another nurse anesthetist, at
3:00 a.m.  Mrs. Hernandez was
taken to the operating room for emergency exploratory laparotomy
surgery at
4:05 a.m.  Surgery began
at
4:20 a.m. and was
completed at 5:20 a.m.  Dr. Piegari’s operative report details that four
liters of blood were found in the abdominal cavity.  There was bleeding from the left lower uterine
segment, which was ligated and sutured. 
The operative notes report that the bleeding was stopped
during surgery.  Dr. Piegari claimed in
his report that Mrs. Hernandez was stable when she left the
operating room and was transferred to the Intensive Care Unit (“ICU”).   But within
30 minutes of arriving in the ICU, Mrs. Hernandez was in full cardiac arrest.  Mrs. Hernandez died at
6:52 a.m. on August 28, 2007. 

          Mrs. Hernandez’s
husband, Santos Hernandez, filed this medical malpractice suit against Dr. Piegari
and his practice group; Doctors Hospital and its owners, Doctors Hospital 1997,
L.P. and Tidwell Parkway Ventures, L.L.C.; and Price.  Dr. Piegari and his practice group were later
nonsuited.  Hernandez alleged that
Doctors Hospital was vicariously liable for the nurses’ negligence and directly
liable for its own acts and omissions.

          Hernandez served Chapter 74 expert
reports from obstetrician-gynecologist Harold J. Miller, M.D., and from
registered nurse Tracy McManaman-Bridges. 
Doctors Hospital and Price objected to the reports and moved for
dismissal pursuant to Chapter 74.  The trial
court denied the motion to dismiss.

Medical Expert Reports

          In
their second issue, Doctors Hospital and Price assert the trial court erred by
failing to dismiss the Hernandezes’ claim for failure to file an expert report
pursuant to section 74.351 of the Texas Civil Practice and Remedies Code.  See
Tex. Civ. Prac. & Rem. Code § 74.351(a) (Vernon Supp. 2010). 

          A.      Standard
of Review

          We review a trial court’s ruling
dismissing a healthcare liability lawsuit pursuant to Chapter 74 of the Texas
Civil Practice and Remedies Code under an abuse of discretion standard.  Am. Transitional Care Centers of Texas v.
Palacios, 46 S.W.3d 873, 877 (Tex. 2001). 
A trial court abuses its discretion if it acts in an arbitrary or
unreasonable manner without reference to guiding rules or principles.  See Garcia v. Martinez, 988 S.W.2d
219, 222 (Tex. 1999).  When reviewing
matters committed to the trial court’s discretion, we may not substitute our
own judgment for that of the trial court. 
Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992).  A trial court does not abuse its discretion
merely because it decides a discretionary matter differently than an appellate
court would in a similar circumstance.  See
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985).  Although we may defer to the trial court’s
factual determinations, we review questions of law de novo.  Rittmer v. Garza, 65 S.W.3d 718, 722
(Tex. App.—Houston [14th Dist.] 2001, no pet.).

          In reviewing whether an expert report
complies with Chapter 74, we evaluate whether the report “represents a
good-faith effort” to comply with the statute. 
Strom v. Mem’l Hermann Hosp. Sys., 110 S.W.3d 216, 221 (Tex.
App.—Houston [1st Dist.] 2003, pet. denied). 
In making this evaluation, we must look only at the information
contained within the four corners of the report.  Bowie Mem’l Hosp. v. Wright, 79 S.W.3d
48, 53 (Tex. 2002).

          B.      Chapter
74 Expert Report Requirements

          Pursuant to section 74.351,
medical-malpractice plaintiffs must provide each defendant physician and health
care provider with an expert report or voluntarily nonsuit the action.  Tex.
Civ. Prac. & Rem. Code § 74.351(a). 
If a claimant timely furnishes an expert report, a defendant may file a
motion challenging the report’s adequacy. 
Id.  The trial court shall
grant the motion only if it appears, after hearing, that the report does not
represent a good faith effort to comply with the statutory definition of an
expert report.  See id. § 74.351(l).  The statute defines an
expert report as a written report by an expert that provides, as to each
defendant, a fair summary of the expert’s opinions as of the date of the report
regarding: (1) applicable standards of care; (2) the manner in which the care
provided failed to meet the standards; and (3) the causal relationship between
that failure and the injury, harm, or damages claimed.  See id. § 74.351(r)(6);  Palacios, 46 S.W.3d at 877.

          Although the report need not marshal
all the plaintiff’s proof, it must include the expert’s opinions on the three
statutory elements—standard of care, breach, and causation.  See Palacios, 46 S.W.3d at 878; Gray
v. CHCA Bayshore, L.P., 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.]
2006, no pet.).  In detailing these
elements, the report must provide enough information to fulfill two purposes if
it is to constitute a good faith effort. 
First, the report must inform the defendant of the specific conduct the
plaintiff has called into question.  Palacios,
46 S.W.3d at 879.  Second, the report
must provide a basis for the trial court to conclude that the claims have
merit.  Id.  A report that merely states the expert’s
conclusions as to the standard of care, breach, and causation does not fulfill
these two purposes.  Id.  “The expert must explain the basis of his
statements and link his conclusions to the facts.”  Bowie, 79 S.W.3d at 52 (citing Earle
v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999)).  Furthermore, in assessing the report’s
sufficiency, the trial court may not draw any inferences, and instead must rely
exclusively on the information contained within the report’s four corners.  See Palacios, 46 S.W.3d at 878.

          C.      Analysis
of Adequacy of Reports

          Doctors Hospital and Price contend
that the expert report submitted by Hernandez is insufficient.  Specifically, they assert that (1) Dr. Miller
is not qualified to state the applicable standard of care, (2) the report does
not adequately state the applicable standard of care or the breaches of the
standard of care purportedly committed by Doctors Hospital and Price and (3)
the report does not adequately set forth how the purported breaches caused Mrs.
Hernandez’s death.

                    1.       Qualifications

          Within
this portion of their second issue, Doctors Hospital and Price assert that Dr.
Miller is not qualified to offer an opinion concerning the standard of care
applicable to Doctors Hospital or the nurses involved in Mrs. Hernandez’s
treatment, Price in particular. 

                              a.       Law
Concerning Expert Qualifications

          Section
74.351(r)(5)(B) states that an expert for the purpose of establishing the standard
of care applicable to a non-physician health care provider must meet the qualifications
of section 74.402.  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B)
(Vernon Supp. 2010).  Section 74.402(b)
provides the following qualifications for an expert:

(b)     In a suit involving a health care liability
claim against a health care provider, a person may qualify as an expert witness
on the issue of whether the health care provider departed from accepted
standards of care only if the person:

 

(1)     is practicing health care in a field of
practice that involves the same type of care or treatment as that delivered by
the defendant health care provider, if the defendant health care provider is an
individual, at the time the testimony is given or was practicing that type of
health care at the time the claim arose;

 

(2)     has knowledge of accepted standards of care
for health care providers for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim; and

 

(3)     is qualified on the basis of training or
experience to offer an expert opinion regarding those accepted standards of
health care.  

 

Tex. Civ.
Prac. & Rem. Code Ann. § 74.402(b)(Vernon
2005).  Section 74.402 continues:  

(c)      In determining whether a witness is
qualified on the basis of training or experience, the court shall consider
whether, at the time the claim arose or at the time the testimony is given, the
witness:

 

(1)     is certified by a licensing agency of one
or more states of the United States or a national professional certifying
agency, or has other substantial training or experience, in the area of health
care relevant to the claim; and

 

(2)     is actively practicing health care in
rendering health care services relevant to the claim.  

 

Tex. Civ.
Prac. & Rem. Code Ann. § 74.402(c).

                              b.       Dr. Miller’s
Qualifications as to Doctor’s Hospital

          Doctors
Hospital asserts that Dr. Miller is not qualified to opine on its hospital
policies and procedures.  Specifically,
Doctors Hospital contends that because Dr. Miller’s career has primarily been
with Baylor College of Medicine, a teaching hospital, and Ben Taub Hospital,
one of the nation’s leading trauma centers, he has no experience working at a
“smaller, tertiary, non-teaching hospital.” 


          Doctors
Hospital cites no authority that an expert must have worked at the same type of
hospital to opine on a standard of care for a hospital—that is, only a doctor
familiar with and having experience in a “smaller, tertiary, non-teaching
hospital” would be qualified to opine on Doctors Hospital’s standard of
care.  The one authority Doctors Hospital
cites in its brief is Reed v. Granbury
Hosp. Corp., 117 S.W.3d 404 (Tex. App.—Fort Worth 2003, no pet.).  We first note that Reed is procedurally distinguishable.  Reed
involved a summary judgment case in which the trial court found two doctors
unqualified to testify as experts concerning the standard of care, specifically
“what protocols, policies, or procedures a hospital of ordinary prudence . . .
would have had in place.”  Reed, 117 S.W.3d at 408–11.  Reed
is also distinguishable substantively. 
In Reed, the court applied the
standards for qualifying an expert under Texas Rule of Evidence 702 and case
law interpreting the rule.  See id. at 409–10 (citing Tex. R. Evid. 702 and cases including Exxon Pipeline Co. v. Zwahr, 88 S.W.3d
623, 628 (Tex. 2002) and Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1988)).

          In
contrast, in this case Dr. Miller’s qualifications are governed by section
74.402.  See Tex. Civ. Prac. &
Rem. Code Ann. § 74.351(r)(5)(B) (stating that expert for establishing
standard of care applicable to non-physician health care provider must meet
qualifications of section 74.402). 
Doctors Hospital and Price do not contend that Dr. Miller does not meet
the qualifications set out in section 74.402 or address section 74.402 in any
way.

          The
first requirement set forth in section 74.402 is that Dr. Miller “is
practicing health care in a field of practice that involves the same type of
care or treatment as that delivered by the defendant health care provider, if
the defendant health care provider is an individual.”  Tex.
Civ. Prac. & Rem. Code Ann. § 74.402(b)(1).  Doctors Hospital is not an individual.  Therefore, this factor does not apply.  However, we note that this claim relates to
the field of Obstetrics and Gynecology. 
Dr. Miller states in his report that he is a licensed physician in Texas
in continuous practice since 1966 and has been a Board Certified
Obstetrician-Gynecologist since 1967. 
Doctors Hospital and Price do not dispute this.  

          The second
statutory requirement is that Dr. Miller “has knowledge of accepted standards
of care for health care providers for the diagnosis, care, or treatment of the
illness, injury, or condition involved in the claim.”  Dr. Miller states in his report that he is
familiar with

the appropriate standards of care pertaining to the
medical and nursing care and treatment of patients who are hospitalized related
to pregnancy, labor, delivery, and post partum (after delivery) care, and
related to the patient being evaluated and treated for pregnancy and delivery,
including complications, problems and disorders related thereto  . .  .
such as intra abdominal bleeding . . . .

 

          The
final requirement of section 74.402 is that the expert must be “qualified on
the basis of training or experience.”  Tex. Civ. Prac. & Rem. Code Ann.
§ 74.402(b)(3).  To evaluate
the expert’s training or experience, we are required to examine whether the
expert is “certified by a licensing agency of one or more states of the United
States or a national professional certifying agency, or has other substantial
training or experience, in the area of health care relevant to the claim
. . . [and] is actively practicing health care in rendering health
care services relevant to the claim.”  See id. § 74.402(c)
(stating court “shall consider” these two factors).  As noted above, Dr. Miller is a Board
Certified Obstetrician-Gynecologist.  In
his report, Dr. Miller stated: 

For the past 43 years, I have been actively engaged in
the practice of obstetrics and gynecology both in the clinical/office and
hospital setting. . . . In each of these settings I have evaluated, treated,
and coordinated the care for several patients who presented with a refusal to
accept blood transfusions, similar to Ms. Hernandez and have evaluated,
treated, and coordinated the care for many patients who presented with signs
and symptoms of intra abdominal bleeding following a c-section, also similar to
Ms. Hernandez.

 

. . . .

 

I reasonably estimate that, over this 43 year period, I
have acted as the attending physician and/or been consulted with in literally
hundreds of times for purposes of coordinating care of a patient with risk
factors for post partum hemorrhage as well as providing direct patient care to
evaluate and treat a patient like Ms. Hernandez, as the attending physician
for, and in consultation with nurses, health care providers, and other
physicians, for purposes of evaluating and treating a patient, like Ms.
Hernandez, who presents with risk factors for post partum hemorrhage, as well
as providing direct patient care on several hundred occasions to evaluate and
treat patients who present with post partum hemorrhage determining what type of
care and treatment is necessary and other reasonably related issues that are
necessary to care for a patient with documented risk factors and/or signs and
symptoms of post partum hemorrhage.

 

Dr. Miller’s report and curriculum
vitae also disclose that he has extensive experience teaching in the field of
obstetrics and gynecology and served as the interim chief of the Department of Obstetrics
and Gynecology at Ben Taub from 2006 to 2009.

          We
conclude that Dr. Miller’s report and curriculum vitae provide a basis to
conclude that he meets section 74.402’s requirements for qualifications of an
expert.  See Tenet Hospitals
Ltd. v. Barnes, No. 08-09-00093-CV, 2010 WL 2929520, at *7–8 (Tex. App.—El
Paso July 28, 2010, no pet.) (holding expert qualified to state standard of
care for hospital where report stated expert had experience with type of claim
at issue, including being “involved in care of about 250 patients” similar to
patient at issue and curriculum vitae showed he was “Chief of Surgery”); see also Rusk State Hosp. v. Black, No.
12-09-00206-CV, 2010 WL 2543470, at *7 (Tex. App.—Tyler June 23, 2010, no pet. h.) (holding
psychologist qualified to opine concerning mental hospital’s standard of care
based in part on psychologist’s “extensive training
and experience in the diagnosis and treatment of mental disorders” and service
“as supervising or consulting psychologist at numerous mental health facilities”).  Accordingly, we hold
that the trial court did not abuse its discretion in finding Dr. Miller
qualified to give an expert report concerning Doctors Hospital’s standard of
care. 

          We
overrule this portion of Doctors Hospital and Price’s second issue.

                              c.       Dr.
Miller’s Qualifications as to Nurses

          Doctors
Hospital and Price also contend that Dr. Miller is not qualified to opine on
the standard of care owed by nurses. 
Specifically, Doctors Hospital and Price assert, “At most, Dr. Miller is
qualified to speak to the standard of care for nursing as it relates to the nurses[’] interactive role with doctors.”  (Emphasis in original).  As with their argument concerning the
standard of care applicable to Doctors Hospital, Doctors Hospital and Price do
not cite, discuss, or analyze the requirements of section 74.402.  

          In
addition to the education, training, and experience detailed above, Dr. Miller
specifically stated:

I am familiar with the appropriate standards of care
pertaining to the nursing care and medical care and treatment of patients at
risk for and who are experiencing post partum hemorrhage.

 

Given my hospital practice, I am familiar with the
appropriate standard of care for nurses as it relates to the proper and timely
communication of critical vital signs information by the hospital nurses, nurse
anesthesiologists, and/or nonphysician health care providers to the treating
physician.

 

I am also familiar with, have undertaken on numerous
occasions, and have taught physicians, nurses and students in the methods for
preventing and alleviating through surgery and otherwise, postpartum
hemorrhage, including, but not limited to intra abdominal bleeding following a
caesarean section.

 

          We
hold that the trial court did not abuse its discretion in finding Dr. Miller
qualified to give an expert report concerning Doctors Hospital’s standard of
care.  Baylor
Med. Ctr., Waxahachie v. Wallace, 278 S.W.3d 552, 558 (Tex.
App.—Dallas 2009, no pet.) (“if the physician states he is familiar with the
standard of care for both nurses and physicians, and for the prevention and
treatment of the illness, injury, or condition involved in the claim, the
physician is qualified on the issue of whether the health care provider
departed from the accepted standards of care”); San Jacinto Methodist Hosp. v. Bennett, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no
pet.) (holding doctor qualified under section 74.402 to testify against nurse
for improper treatment of decubitus ulcer because he stated that he was
familiar with standard of nursing care for ulcers). 

          We
overrule this portion of Doctors Hospital and Price’s second issue.

                    2.       Standard
of Care and Breach          

          Within
this portion of their second issue, Doctors Hospital and Price contend that Dr.
Miller’s report is insufficient concerning the statutory elements of standard
of care and breach of the standard of care because it contradicts “the
objective facts within the medical records [that] Dr. Miller reviewed.”  

          We review the sufficiency of
Dr. Miller’s report by looking within the four corners of the report.  See
Wright, 79 S.W.3d at 53; Palacios, 46 S.W.3d at 878.  Doctor’s Hospital and Price cite two
unpublished opinions to support their contention that our review may include a
comparison of Dr. Miller’s report to the facts of the medical record.  See Kloeris
v. Stockdale, No. 01-09-00711-CV, 2010 WL 1241305, at *6 (Tex. App.—Houston
[1 Dist.], Apr. 1, 2010, pet. denied); Reddy v. Seale, No. 09-07-00372-CV, 2007
WL 5011608, at *6 (Tex. App.—Beaumont Mar. 20, 2008, no pet.) (mem. op.).  We disagree that our review can extend to the
underlying medical records.  

          First, the Supreme Court of Texas has
stated that review of expert reports is focused on the report itself.  See Wright, 79 S.W.3d at 53 (“We
have held that the only information relevant to whether a report represents a
good-faith effort to comply with the statutory requirements is the report
itself.”); Palacios, 46 S.W.3d
at 878 (“[T]the only
information relevant to the inquiry is within the four corners of the document.”);
see also Strom, 110 S.W.3d at
221 (“The trial court may not look beyond the report, therefore, in determining
compliance with the statute.”).  Second,
in Kloeris, although this Court did
address the defendant doctor’s argument that the medical records did not
support the expert’s report under Reddy,
this Court stated twice in the opinion that the appropriate scope of review was
confined to the four corners of the report. 
See Kloeris, at *4 (“In
determining whether the expert report represents an ‘objective good-faith
effort’ to comply with the statute, we look only to the four corners of the
report.”); id. at *6 (“In determining
whether an expert report constitutes a ‘good-faith effort’ to comply with the
requirements of section 74.351(r)(6), we look only to the four corners of the
report.”).  Finally, this Court recently
confirmed that our review is confined to the four corners of the report.  Mettauer
v. Noble, No. 01-10-00167-CV, 2010 WL 3833954, at *5 (Tex. App.—Houston
[1st Dist.] Sept. 20, 2010, no pet. h.).

          Because our review is confined to the
four corners of Dr. Miller’s report, we overrule the portion of appellants’
second issue asserting that the report contradicts the medical records.

 

                    3.       Causation

          Within this portion of their second
issue, Doctor’s Hospital and Price contend that Dr.
Miller’s report is insufficient concerning the statutory element of
causation.  In part, this challenge is
based upon the assertion that Dr. Miller’s conclusions are “precluded by the
facts found in the medical records he reviewed.”  As discussed above, our review is of Dr.
Miller’s report itself, not a comparison of the report to the records.  See Wright, 79 S.W.3d at 53; Palacios,
46 S.W.3d at 878.  

          Doctors
Hospital and Price also assert that Dr. Miller’s report concerning causation is
insufficient because it is conclusory and speculative concerning how the delay
in treatment stated by Dr. Miller is causally related to Ms. Hernandez’s
death.  An expert report must include a fair summary of the
causal relationship between the defendant’s failure to meet the appropriate
standard of care and the injury, harm, or damages claimed.  Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).  An expert cannot merely state his conclusions
or “provide insight” about the plaintiffs’ claims, but must instead “explain
the basis of his statements to link his conclusions to the facts.”  Wright,
79 S.W.3d at 52.  

          After detailing facts of the case, Dr.
Miller states, 

In summary, the nurses should be able to recognize any
critical change in vital signs consistent with post partum hemorrhage.  They failed to recognize critical changes in
Ms. Hernandez[’s] blood pressure and heart rate consistent with post partum
hemorrhage that led to an unreasonable delay in treatment causing prolonged
bleeding that led to hemorrhage and eventual death by exsanguination.

 

Dr.
Miller’s report concludes, 

In all medical probability (greater than 50%), if Ms.
Hernandez had been operated on sooner she would have lived. . . .  There was evidence that this patient [was] in
hemorrhagic shock when she developed hypotension and tachycardia at 0120 and
confirmed at 0150 hours with continued drop in blood pressure[.] Additional
information followed at 0205 with a BP of 75/50 and P – 109[.]  Later on an Hct of 24.2 clearly indicated
intra-abdominal bleeding.  If this
patient had been taken back to surgery at this time instead of 0410 hours in
all medical probability (greater than 50%) she would have survived.

 

Dr.
Miller also opined, after detailing purported breaches of various standards of
care, that “the violations of the standards of care that caused unreasonable delay
also caused delay in conducting the surgery. 
It was too late to save Ms. Hernandez and she bled to death.”  

          Additionally, throughout Dr. Miller’s
sixty-two page report, he identifies specific standards of care, breaches of
those standards, and then states that the breach of the standard of care
“lead[] to post partum hemorrhage leading to death caused by exsanguination,”
or similar language concerning the delay causing Ms. Hernandez’s death due to
blood loss.  For example, the language
just quoted concludes a paragraph stating, “The hospital is responsible for the
nursing staff[’]s understanding of the standard of care that requires the nurse
to monitor the vital signs of a postoperative patient every 15 min while the
patient is in the PACU.”  Dr. Miller
further states that the records reflect that this standard of care was breached
because the records show 55 minutes elapsed between the recording of vital
signs.[1]

          We conclude Dr. Miller sufficiently
linked his conclusions to the facts of the case.  See Hayes v. Carroll,
314 S.W.3d 494, 507 (Tex. App.—Austin 2010, no pet.) (stating report
adequately stated causation where report stated “failure to notice the presence
of the bandage and monitor the effect it had on Carroll’s leg caused the
bandage and its effects to go undetected, which caused the damage requiring
amputation of her leg”); Fagadau v.
Wenkstern, 311 S.W.3d 132, 139 (Tex. App.—Dallas 2010, no pet.)
(stating report adequately stated causation where report stated “if Wenkstern
had been sufficiently examined in his initial visit and re-examined either by
Dr. Fagadau or another physician within two weeks, the tears in Wenkstern’s
right eye would have been found in time to be treated successfully with a laser
before the retina detached”). 

          We
overrule this portion of Doctors Hospital and Price’s second issue.

          D.      Conclusion
Concerning Adequacy of Dr. Miller’s Report

          “The
expert report is not required to prove the defendant’s liability, but rather to
provide notice of what conduct forms the basis for the plaintiff’s complaints.”  Hayes,
314 S.W.3d at 508.  Doctors Hospital and
Price’s disagreement with Dr. Miller’s report does not render the report
conclusory or inadequate.  See Fagadau, 311 S.W.3d at 139.  Also, whether the trier of fact may later
disagree with Dr. Miller and find in favor of Doctors Hospital and Price does
not render Dr. Miller’s report inadequate. 
See Hayes, 314 S.W.3d at 508. 
We conclude that Dr. Miller’s report provides adequate notice to Doctors
Hospital and Price of the conduct that forms the basis for the Hernandezes’
lawsuit and also provides a basis for the trial court to conclude the Hernandezes’
claims have merit.  See Palacios, 46 S.W.3d at 879.  We, therefore, hold that the trial court did
not abuse its discretion in denying the motion to dismiss.

          We overrule Doctors Hospital’s and
Price’s second issue.[2]

Conclusion

          We affirm the order of the trial
court.

 

                                                                      Elsa
Alcala

                                                                      Justice


 

Panel consists of Justices
Jennings, Alcala, and Higley.











[1]         Other standards of care and breaches
identified by Dr. Miller include: failing to discuss alternatives to blood
transfusion, failure of nurses to identify the physician of change in clinical
status, failing to ensure effective communication with Ms. Hernandez who did
not speak English, failure to assess the epidural site to rule it out as a
source of bleeding, and failure of the nursing supervisor to ensure the nurses
caring for Mrs. Hernandez had appropriate nursing skills.  Dr. Miller stated after each of these
breaches, in varying language, that the failure to adhere to the standard of
care “caused an unreasonable delay in [Mrs. Hernandez’s] care and contributed
to her eventual death by exsanguination.”





[2]         Doctors Hospital and Price included a
first issue in their brief.  However, the
entire first issue is a statement of the law that an expert report must be
served in healthcare liability claims. 
Within this “issue,” Doctors Hospital and Price do not assert that the
trial court erred in any way.  Because it
raises no purported error for this Court to review, we overrule Doctors
Hospital and Price’s first issue. 

 

          Additionally,
within their brief, Doctors Hospital and Price contend that the expert report
of Nurse McManaman-Bridges is not adequate. 
Having concluded the report of Dr. Miller is adequate concerning both
Doctors Hospital and Price, we need not address the adequacy of
McManaman-Bridges’s report.  See
Bakhtari v. Estate of Dumas, 317
S.W.3d 486, 489 (Tex. App.—Dallas 2010, no pet.) (declining to address
challenges to second expert report where court found one expert report
adequate) (citing Tex.
R. App. P. 47.1).