**Opinion issued December 31, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00820-CV

———————————

**MUSTAFA ISMAIL NAEEM, M.D., Appellant**

**V.**

**JAMES GURLEY, Appellee**

**And**

———————————

## NO. 01-20-00130-CV

———————————

**COMPREHENSIVE PHARMACY SERVICES, LLC, Appellant**

**V.**

**JAMES  GURLEY, Appellee**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-76193**

---

## MEMORANDUM OPINION

Appellants Mustafa Ismail Naeem, M.D. and CPS have filed related interlocutory appeals challenging the trial court's denial of their respective motions to dismiss the healthcare liability claims filed against them by appellee, James Gurley. Dr. Naeem and CPS argue that the trial court abused its discretion by denying their motions to dismiss because Gurley's expert reports do not sufficiently address the elements of standard of care, breach, and causation. We affirm the trial court's orders denying Dr. Naeem's and CPS's motions to dismiss.

## Background

The reports prepared by Gurley's experts, Dr. Bruce Decter, a cardiologist, and Dr. Julio Viola, a pharmacist, provide the background facts in this appeal. The medical records are not before us, and we accept the factual statements in the reports for the limited purpose of this appeal.[1]

---

[1] *See Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Shenoy v. Jean*, No. 01–10–01116–CV, 2011 WL 6938538, at *1 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, pet. denied) (mem. op.)). CPS and another defendant, Dr. Mustafa Naeem, are appealing the denial of their respective motions to dismiss which are based on different expert reports. Specifically, Dr. Naeem is challenging the sufficiency of Dr. Decter's March 2019 expert report, whereas CPS is challenging the sufficiency of Dr. Decter's and Dr. Viola's original and supplemental reports. Although the parties provide additional information regarding CPS's and Dr. Naeem's involvement in Gurley's medical care, we are limited to the four-corners of these reports and will not consider the additional factual assertions, or any materials attached to a party's brief. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

Gurley is a 78-year-old man with a history of paroxysmal atrial fibrillation,[2] coronary artery disease, coronary bypass surgery, high blood pressure, dyslipidemia, hypothyroidism, prostatic disease, and an open abdominal aortic aneurysm repair.

Gurley was admitted to the St. Luke's Hospital at the Vintage (St. Luke's) on August 14, 2016 for a change in mental status, shortness of breath, generalized weakness not associated with his extremities, fever, and hyponatremia.[3] His medical records indicate that he developed rapid atrial fibrillation on August 16, 2016 and he was transferred to St. Luke's intensive care unit (ICU) that day, where he was started on intravenous amiodarone. On August 17, 2016, Gurley reverted to sinus rhythm[4] and cardiologist Dr. Arsalan Shahzad decreased the rate of the intravenous amiodarone to 0.5 mgs per minute. Gurley received approximately 12,000 mg of amiodarone intravenously from August 16, 2016 until August 25, 2016.

On August 25, 2016, a St. Luke's physician[5] discontinued Gurley's intravenous dosage and prescribed an oral dosage of 200 mg of amiodarone three times a day (600 mg per day). Gurley remained in sinus rhythm and was administered 600 mg per day of amiodarone until he was discharged from St. Luke's

---

[2]     Atrial fibrillation is an irregular and often rapid heart rate.

[3]     Hyponatremia refers to a low level of sodium in the blood.

[4]     Sinus rhythm means a normal heartbeat.

[5]     Dr. Decter's first report, which is the only report applicable to Dr. Naeem's appeal, does not identify the physician who changed Gurley's prescription on August 25, 2016.

on September 9, 2016. CPS is the contracted pharmacy provider that filled all of Gurley's prescriptions while he was hospitalized at St. Luke's.

On September 9, 2016, Gurley was transferred to the Vosswood Nursing Home for physical therapy services. Gurley, who was "quite debilitated" by that time, needed assistance to do almost anything and had to use a wheelchair when he was out of bed. He was referred for physical therapy "due to decline in functional mobility due to hyponatremia and prolonged hospitalization," and "pain, decrease in muscle strength, poor balance, coordination and activity tolerance, increased need of assistance and [his inability] to participate with ambulation." Gurley, who was under the care of Dr. Kaveh Samani while he was at Vosswood, continued to receive oral doses of 600 mg per day of amiodarone.

Gurley was transferred back to St. Luke's on October 3, 2016 because he was weak and unable to participate in rehabilitation therapy. At that point, Gurley had persistent weakness in his right lower extremity and left upper extremity with no loss in sensation. Neurologist Fayaz Ahmed Faiz examined Gurley and noted that Gurley had not shown any improvement and "his progression of muscle weakness continued to get worse." Dr. Faiz determined that Gurley had progressive muscle weakness leading to quadriplegia. Gurley was transferred back to Vosswood on October 7, 2016, where he continued to receive oral doses of 600 mg per day of amiodarone.

On November 30, 2016, Gurley was evaluated for worsening weakness, atrophy, and sensory changes and admitted to Veterans Administration Medical Center (VA) for inpatient neurology services. Gurley's treating physicians at the VA determined that he was amiodarone toxic and discontinued the amiodarone. Gurley was discharged from the VA with a diagnosis of "acute on chronic severe axonal polyneuropathy, multifactorial (toxic secondary to amiodarone, critical-illness-related from prolonged ICU admission, West Nile Virus-associated)."

Gurley sued Dr. Naeem, CPS, and others for medical malpractice. In March 2019, Gurley served all the defendants, including Dr. Naeem and CPS, with Dr. Decter's and Dr. Viola's expert reports.

In his first report, which is the only report applicable to Dr. Naeem, Dr. Decter opined:

> One of the major contributing factors to Mr. Gurley's rapid decline in neurologic health was clearly amiodarone toxicity. Amiodarone is only labelled by the FDA to only treat life threatening ventricular arrhythmias, the drug is used to treat atrial fibrillation. It has a narrow toxic-therapeutic window and has a long half life of 58 days. When treating atrial fibrillation, a loading dose is given up to 10 grams and then a dose of 200 mg per day. Amiodarone is associated with toxicity involving the lungs, thyroid gland, liver, eyes, skin and nerves.[6]

---

[6] The half-life of a drug is the time taken for the plasma concentration of the drug to reduce to half its original value. Half-life is used to estimate how long it takes for a drug to be removed from the body. Thus, 300 mgs of one 600 mg dose of amiodarone will remain present in the patient's body fifty-eight days after the medication is administered.

Dr. Decter states that "neurologic toxicity may take many forms including tremor, ataxia,[7] peripheral neuropathy[8] with paresthesia[]s, and sleep disturbances," that studies show that the effects of neurologic toxicity appear in 3 to 30 percent of patients taking amiodarone, and that these effects "appear to be dose-related, being more common during initial loading or in patients requiring higher doses." He further states that neurologic side effects were "much less common" in "trials of chronic low-dose amiodarone therapy (mean dose 150 to 330 mg/day)."

Dr. Decter stated that Gurley received approximately 12,000 mg of amiodarone intravenously from August 16, 2016 until August 25, 2016 and then 600 mg per day every day until November 30, 2016. According to Dr. Decter, the "amiodarone was prescribed by Mr. Gurley's cardiologist Dr. Arsalan Shahzad and by the pulmonologist in the ICU [Dr. Naeem] in St. Luke's Hospital at the Vintage and by Dr. Kaveh Samani at the Vosswood Nursing Home." Dr. Decter noted that Gurley's initial intravenous does of twelve grams of amiodarone "is 2 grams above the usual loading dose" and that Gurley received 600 mg per day of amiodarone for the next 98 days, which is three times the daily recommended dose for patients with

---

[7]     Ataxia describes a lack of muscle control or coordination of voluntary movements, such as walking or picking up objects.

[8]     The term peripheral neuropathy refers to damage to peripheral nerves, i.e., the nerves outside of the brain and spinal cord, and often causes weakness, numbness and pain, usually in the hands and feet.

6

atrial fibrillation. Dr. Decter opined that 600 mg of amiodarone per day "was a toxic dose for Mr. Gurley contributing to the quadriplegia he developed, and his neurologic decline as stated by the neurologists at the Houston VA Medical Center."

Dr. Decter also opined:

Physicians who use amiodarone must use the lowest dose possible to avoid these side effects and discontinue treatment as soon as an adverse effect has occurred . . . . Because of its potential toxicities, amiodarone should only be used after consideration of risks and when other agents have failed or are contraindicated. Mr. Gurley should have been given dronedarone which does not have the toxicity that amiodarone has and should have never been continued on amiodarone, especially at a dose that was three times the recommended dose. . . . Dr. Arsalan Shahzad, Dr. Mustafa Ismail Naeem and Dr. Kaveh Samani all prescribed a supratherapeutic dose of amiodarone (600 mg per day instead of 200 mg per day) which was a deviation in the standard of care and led to the peripheral neuropathy and the quadriplegia he suffered from after his hospitalization of August 2016.

Dr. Viola stated in his report that Gurley "was diagnosed to have A-fib with RVR" when he presented to St. Luke's Emergency Room and he "received IV amiodarone and subsequently he was switched to oral amiodarone therapy." According to Dr. Viola, "Amiodarone is a medication that is indicated for the treatment of ventricular arrhythmias" and it "should not have been used as a first line agent to treat Mr. Gurley." He explained that there are other medications, such as metoprolol and verapamil, that "a well-trained physician would use before using a medication such as amiodarone in an off label manner." He also stated that "in 2014 the American Heart Association/American College of Cardiology/Heart

Rhythm Society AF guidelines state[d] that amiodarone can be used as a second line therapy for chronic rate control only when other therapies are unsuccessful or contraindicated," and that if amiodarone is used, the patient should be carefully monitored for side effects. Dr. Viola further opined:

> Mr. Gurley should have never received the amiodarone as a first line agent. The Pharmacists of CPS should have questioned the use of this agent in a patient that presented with acute A-Fib. There was no reason to start or continue Mr. Gurley on a medication that was being used off-label. It is well known that the side effects of amiodarone can be very severe and patients need careful monitoring. Due to the amiodarone dose that Mr. Gurley was given at CHI St. Luke's Hospital he developed amiodarone toxicity that contributed to his quadriparesis.

With respect to CPS, Dr. Decter further opined:

> I have reviewed the report of Julio Viola, B.S,, M.S., PharmD, where he addresses the negligence and breach of the standard of care by Comprehensive Pharmacy Services (CPS), since that pharmacy supplied the Amiodarone received by Mr. Gurley during his St. Luke's Hospital admissions. The negligence of CPS, as outlined in the opinions of Dr. Viola, in reasonable medical probability, was also a medical cause of the peripheral neuropathy and quadriplegia caused by the supratherapeutic dosing of Amiodarone.

Dr. Naeem and CPS filed objections to the reports and motions to dismiss Gurley's healthcare liability claims against them pursuant to section 74.351(b) of the Texas Civil Practice and Remedies Code. After holding a hearing on Dr. Naeem's and CPS's motions, the trial court denied Dr. Naeem's motion to dismiss and granted Gurley a 30-day extension to cure deficiencies in his reports with respect to CPS. Dr. Naeem appealed.

8

On November 21, 2019, Gurley served supplemental expert reports prepared by Mr. Viola and Dr. Decter to CPS.

In his supplemental report, Dr. Viola further elaborated on "how the pharmacists at CPS fell below or deviated from the standard of care in this case" with respect to Gurley during his hospitalizations at St. Luke's. Dr. Viola stated that "the standard of care for the CPS pharmacists at CHI-St. Luke's Hospital is to be aware of the limitations and dosages with respect to Amiodarone whenever they receive a physician's order for a patient such as Mr. Gurley." Specifically, to Dr. Viola, pharmacists "know, or should know, about Amiodarone dosage, its long-term effects, and how . . . it can lead to the type of Amiodarone toxicity suffered by Mr. Gurley, as reflected in his medical records, and causing quadriplegia that is discussed in the expert report of Dr. Bruce M. Decter." Pharmacists "regularly advise physicians of what Amiodarone can medically cause; and it is part of our duties and responsibilities as pharmacists to be not only aware of what excessive doses of Amiodarone can cause, and also to warn and advise physicians when it appears as though Amiodarone is being prescribed and administered contrary to good practices."

According to Dr. Viola, "Amiodarone is a medication that is indicated for the treatment of ventricular arrhythmias" and, according to the FDA, it "should not be used as a first line agent to treat patients such as Mr. Gurley who was suffering from

atrial fibrillation (A-fib)." According to Gurley's hospital chart, he was diagnosed as experiencing one brief episode of A-Fib when he was hospitalized at St. Luke's and there was no "indication that he was ever suffering from atrial fibrillation during the remainder of either of his stays" at St. Luke's or that he was ever diagnosed as having ventricular arrhythmias. Dr. Viola further states:

> Even though the FDA has stated that Amiodarone should not be used as a first line agent to treat A-fib, and even though the American Heart Association/American College of Cardiology/Heart Rhythm Society AF Guidelines state that Amiodarone can be used as a second line therapy for chronic rate control only when other therapies are unsuccessful or contraindicated, my review of Mr. Gurley's hospital chart at CHI-St. Luke's Hospital indicates that Mr. Gurley's treating physicians initially ordered Amiodarone as a first line agent and that other medications and therapies were not initially ordered and tried and proved to be unsuccessful prior to ordering Amiodarone for Mr. Gurley.

In his report, Dr. Viola further opined, in part, that because amiodarone was being used in an off-label manner to treat atrial fibrillation,

> the standard of care required the CPS pharmacists at CHI-St. Luke's Hospital to be aware that the physicians' orders for Amiodarone were contrary to the manufacturer's recommendations, and the standard of care required the CPS pharmacists to also be aware that prolonged administration of Amiodarone in the overdosages that Dr. Decter describes in his expert report, as reflected in Mr. Gurley's hospital chart, were contrary to the proper usage and administration of Amiodarone and could lead to a number of adverse complications to Mr. Gurley, including the quadriplegia for which he was ultimately diagnosed.

He further states:

> With respect to the overdoses of Amiodarone that Dr. Decter describes in his report, and the continual physician orders for those overdoses of

10

Amiodarone while Mr. Gurley was confined at CHI-St. Luke's Hospital, the standard of care required the CPS pharmacists to notify each physician ordering Amiodarone, such as Dr. Shahzad and Dr. Naeem, that their physician orders for those doses and prolonged use of Amiodarone were contrary to the recommended safe administration and use of Amiodarone for Mr. Gurley, and to point out the availability of a number of other medications such as Metroprolol, for long-term maintenance dosage for a patient who may develop atrial fibrillation. My review of Mr. Gurley's hospital chart does not reflect that the CPS pharmacists at CHI-St. Luke's Hospital ever notified either Dr. Shahzad and/or Dr. Naeem of the overdoses they were prescribing and ordering for Mr. Gurley, nor does my review of Mr. Gurley's hospital chart reveal that the CPS pharmacists at CHI St. Luke's Hospital ever advised and informed Dr. Shahzad and/or Dr. Naeem of the potential long-term effects of continuing to prescribe and administer Amiodarone over a long period of time, as was the case when Mr. Gurley was hospitalized at CHI-St. Luke's Hospital prior to the ultimate diagnosis that he was suffering from Amiodarone toxicity. For the reasons that I set forth in my first report, this report, and in Dr. Decter's written report, these failures on the part of the CPS pharmacists at CHI-St. Luke's Hospital are a deviation from the standard of care for pharmacists under the facts and circumstances of this case.

I would like to further point out that even if it is customary for some cardiologists to prescribe the "Off-Label" use of Amiodarone for the treatment of chronic atrial fibrillation at a dosage of no more than 200 mg per day, Mr. Gurley's medical chart at CHI-St. Luke's Hospital reflects that Dr. Shahzad and Dr. Naeem were overdosing Mr. Gurley with a daily dose of 600 mg of Amiodarone per day. The standard of care required that the CPS pharmacists receiving such daily orders bring the fact of that continual overdosage to the attention of Dr. Shahzad and Dr. Naeem. However, my review of Mr. Gurley's hospital chart at CHI-St. Luke's Hospital indicates that no such warning or admonition was ever given by the CPS pharmacists to those physicians, and Mr. Gurley continued to receive an overdose of Amiodarone of 600 mg per day throughout the times that he was hospitalized at CHI-St. Luke's Hospital. This is also a deviation from the standard of care by the CPS pharmacists under the facts and circumstances of this case.

In his supplemental report, Dr. Decter further elaborated on how CPS's negligence, as described by Dr. Viola, "was also a medical cause of the peripheral neuropathy and quadriplegia caused by the supratherapeutic dosing of amiodarone, as was the case with Mr. Gurley." Dr. Decter reiterated that Gurley received "600 mg per day for the subsequent 98 days, which is three times the recommended 'maintenance' dose for amiodarone" and that "[t]he deviation from the standard of care by [Dr. Shahzad and Dr. Naeem] in prescribing the overdosage of amiodarone for Mr. Gurley also parallels the deviation from the standard of care by CPS as described by Dr. Viola, for the same reasons and for the same prolonged period of time as I described in my original report." Dr. Decter further stated, "It appears as though neither Dr. Shahzad nor Dr. Naeem adequately educated themselves and informed themselves about the potential adverse effects of amiodarone if it is prescribed in high dosages for a prolonged period of time, as was the case with Mr. Gurley." According to Dr. Decter,

> Pharmacists such as those with CPS are not like warehouse workers who provide items off a shelf to fill a customer's orders. They must consider the indication and side effects of the medications as well [as] interactions with other medications a patient is taking such as Mr. Gurley. As Dr. Viola describes in his report, pharmacists are required to be educated and knowledgeable about the medications, particularly medications such as amiodarone, which has a narrow therapeutic window and has such serious adverse effects and such limited uses. As Dr. Viola describes, CPS has a responsibility to protect patients and to advise and warn physicians like Dr. Shahzad and Dr. Naeem who prescribe Amiodarone for patients such as Mr. Gurley that the dose was inappropriate for him.

12

Dr. Decter then explains how CPS's breach of the applicable standard of care described by Dr. Viola caused Gurley's injury.

> If CPS had advised and warned Dr. Shahzad and Dr. Naeem that amiodarone should only be prescribed for atrial fibrillation patients when other agents or medications have failed or are contraindicated, and only then, in the lowest dose possible to avoid adverse side effects, Dr. Shahzad and Dr. Naeem would have followed the standard of care and heeded both warnings and advice from CPS, and chosen a less toxic medication such as dronedarone, as I described in my original report. Further, if CPS had advised and warned Dr. Shahzad and Dr. Naeem about the overdosage of 600 mg per day, I believe Dr. Shahzad and Dr. Naeem would have also heeded that advice and warning from CPS; and even if they were continuing to prescribe amiodarone for paroxysmal atrial fibrillation, they would have lowered the daily dosage to only 200 mg, in order to avoid amiodarone toxicity. In my review of Mr. Gurley's hospital chart at CHI-St. Luke's Hospital, I see no such warnings being provided to Dr. Shahzad and Dr. Naeem by CPS, which obviously contributed to Mr. Gurley's continuing to be overdosed with amiodarone while hospitalized at CHI-St. Luke's Hospital, becoming amiodarone-toxic, and iatrogenically causing Mr. Gurley's quadriplegia as I have described in my original report and as is documented in Mr. Gurley's medical records at the V.A. Hospital and thereafter.[9]

---

[9]   Dr. Decter also attempts to link CPS's conduct with amiodarone that was dispensed by another pharmacy while Gurley was at Vosswood:

> When Mr. Gurley was transferred to Vosswood Nursing Home, Dr. Kaveh Samani continued overdosing Mr. Gurley 600 mg of Amiodarone per day. Dr. Samani may claim that he was merely continuing to prescribe 600 mg of Amiodarone daily because that was the dosage of amiodarone chosen by his prior primary treating physicians, Dr. Shahzad and Dr. Naeem. Although that does not excuse Dr. Samani's deviation from the standard of care, it is further evidence of how CPS's failure to highlight and warn Dr. Shahzad and Dr. Naeem caused Mr. Gurley to receive supratherapeutic doses of amiodarone over 98 days, which in a reasonable degree of medical certainty iatrogenically caused his Amiodarone toxicity and quadriplegia as I

13

CPS objected to both supplemental reports and moved for dismissal of Gurley's claims. The trial court denied CPS's motion. CPS appealed.

**Chapter 74 Expert Reports**

Section 74.351 of the Civil Practice and Remedies Code serves as a gatekeeper through which no medical negligence cause of action may proceed until the plaintiff has made a good-faith effort to demonstrate that a qualified medical expert believes that a defendant's conduct breached the applicable standard of care and caused the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6). To constitute a good-faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claim has merit. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001). A report that merely states the expert's conclusions about standard of care, breach, and causation does not fulfill these two purposes. *See id.* at 879. The expert must explain the basis for his statements and link his conclusions to the facts. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). In determining whether the report meets those requirements, the court should look no further than the report itself, because all the information

___

described in my original report, and as is documented in Mr. Gurley's medical records.

14

relevant to the inquiry must be contained within the report's four corners. *See id.* (citing *Palacios*, 46 S.W.3d at 878). Although the report need not marshal all the plaintiff's proof, it must explain the basis of the expert's statements sufficiently to link the expert's conclusions to the facts. *See Wright*, 79 S.W.3d at 52 (citing *Palacios*, 46 S.W.3d at 878); *see also Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (stating four-corners requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended").

The purpose of the expert-report requirement is to deter frivolous claims, not to dispose of claims regardless of their merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). Accordingly, the Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in favor of plaintiffs." *Henry v. Kelly*, 375 S.W.3d 531, 535 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring and dissenting) ("An expert report, as we have interpreted it, is a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous.").

### Standard of Review

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *See Palacios*, 46 S.W.3d at 875. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding

15

rules or principles. *Wright*, 79 S.W.3d at 52. As the reviewing court, we may not substitute our own judgment for that of the trial court merely because we would have ruled differently. *Id.* When reviewing decisions for an abuse of discretion, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006).

## Standards of Care and Breach

Dr. Naeem argues that Dr. Decter's report is insufficient as to the elements of standard of care and breach. Specifically, Dr. Naeem argues that Dr. Decter applies the same standard to him, Dr. Shahzad, and Dr. Samani but he does not explain why this standard applies to all three health care providers. Dr. Naeem further argues that (1) the report does not identify when he allegedly prescribed amiodarone to Gurley, the dosage or the frequency of the amiodarone prescribed, (2) the report does not address whether Dr. Naeem's prescription was interrupted by another treating physician's prescription and, if so, when it was interrupted, and (3) Dr. Decter's discussion of Dr. Naeem's conduct and the conduct of two other treating physicians cumulatively renders it impossible to ascertain Dr. Naeem's breach.

CPS argues that Dr. Viola's expert report fails to provide a fair summary of his opinions regarding CPS's standard of care and breach because (1) Dr. Viola did not explain how CPS was aware that amiodarone was being used as a first line agent for treatment of atrial fibrillation, (2) his report includes conflicting and conclusory

16

opinions on whether 600 mg/day over a prolonged period constitutes an overdose, and (3) Dr. Viola admits he has not reviewed CPS's policies and procedures, and therefore, his opinion is speculative and conclusory.

## A. Applicable Law

Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880. Identifying the standard of care is critical because "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Id*. "While a fair summary is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant. *See Univ. of Tex. Med. Branch v. Railsback*, 259 S.W.3d 860, 864 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 748 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

## B. Dr. Decter's Opinion with Respect to Dr. Naeem's Breach of the Applicable Standard of Care

In his report, Dr. Decter states that Dr. Naeem is a pulmonologist in St. Luke's ICU who prescribed an oral dose of 600 mg per day of amiodarone to Gurley while he was hospitalized there. According to Dr. Decter, Gurley, who was hospitalized at

St. Luke's on August 14, 2016, was administered this oral dosage from August 25, 2016 until he was discharged on September 9, 2016. He also received the same daily oral dose of amiodarone when he was subsequently hospitalized at St. Luke's from October 3, 2016 until October 7, 2016.

According to Dr. Decter, an oral dose of 600 mg per day is three times more than the recommended dose of 200 mg per day for atrial fibrillation. Dr. Decter states that amiodarone has a "narrow toxic-therapeutic window" and "a long half life of 58 days," and has several known side effects, including neurologic toxicity. According to Dr. Decter, neurologic toxicity can take many forms, including ataxia and peripheral neuropathy with paresthesia (e.g., lack of muscle control or coordination, muscle weakness, and pain due to peripheral nerve damage). He further states that the "frequency of most adverse effects is directly related to the total amiodarone exposure which includes dosage" and that these effects are "much less common" at lower doses. Dr. Decter opines that because of amiodarone's potential neurological toxicities, "[p]hysicians who use amiodarone must use the lowest dose possible to avoid these side effects and discontinue treatment as soon as an adverse effect has occurred." He further opines that Gurley should have been given dronedarone, a drug that does not have the same toxicity as amiodarone, and that Gurley "should have never been continued on amiodarone, especially at a dose that was three times the recommended dose." Dr. Decter further opines that prescribing "a

supratherapeutic dose of amiodarone (600 mg per day instead of 200 mg per day) [is] a deviation in the standard of care."

After reviewing the report in its entirety, we conclude that Dr. Decter's report informs Dr. Naeem that, as a physician prescribing amiodarone, he has a duty to not prescribe more than 200 mg per day of the drug to a patient because supratherapeutic doses of amiodarone can cause peripheral nerve damage. Dr. Decter also informed Dr. Naeem that he breached this standard by prescribing Gurley 600 mg of amiodarone per day, which is three times the recommended dose for patients with atrial fibrillation. Having done so, the report provided Dr. Naeem with a fair summary of Dr. Decter's opinion concerning how Dr. Naeem failed to meet the applicable standard of care. *See Palacios*, 46 S.W.3d at 880. The report also informed Dr. Naeem of the specific conduct that Gurley has called into question—Dr. Naeem's daily prescriptions of over 200 mg per day of amiodarone while he was hospitalized at St. Luke's. *See id.* at 879.

Whether Dr. Decter's opinion regarding the appliable the standard of care is correct or even reasonable is not relevant to the analysis of whether his opinion constitutes a good-faith effort to meet the statute's requirements. *See Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017). Similarly, the accuracy of the facts that Dr. Decter relies upon and the factual inferences he has drawn from those facts is not before us. "The court's role is not to determine the

19

truth or falsity of the expert's opinion, or the facts upon which the expert bases such opinions, but to act as a gatekeeper in evaluating the sufficiency of the report itself." *Holt v. Holt*, No. 01-17-00008-CV, 2017 WL 3483211, at *3 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, pet. denied) (mem. op.) (citing *Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.)).

We conclude that the trial court reasonably could have determined that Dr. Decter's report represents a good-faith effort to inform Dr. Naeem of the applicable standard of care and manner in which Dr. Naeem allegedly breached that standard. *See Larson*, 197 S.W.3d at 304 (stating when reviewing for abuse of discretion, "[c]lose calls must go to the trial court").

Dr. Naeem argues that Dr. Decter's opinion is deficient because he states that all three of Gurley's physicians, Dr. Naeem, Dr. Shahzad, and Dr. Samani, owed that same duty to Gurley, without explaining the basis for his opinion. In his report, Dr. Decter states that Dr. Shahzad, who treated Gurley at St. Luke's along with Dr. Naeem, and Dr. Samani, who treated Gurley at Vosswood, also "prescribed a supratherapeutic dose of amiodarone (600 mg per day instead of 200 mg per day) which was a deviation in the standard of care and led to the peripheral neuropathy and the quadriplegia he suffered from after his hospitalization of August 2016." The report reflects that all three physicians prescribed amiodarone to Gurley, and therefore, they each owed Gurley the same duty, namely, the duty of a treating

20

physician to not prescribe a patient more than 200 mg per day of amiodarone. Accordingly, we conclude that Dr. Decter was not required to address the standard of care applicable to Dr. Naeem separately in order for his report to satisfy Chapter 74's requirements with regard to standard of care and breach. *See Sanjar v. Turner*, 252 S.W.3d 460, 467 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("nothing . . . explicitly forbids applying the same standard of care to more than one physician if, as in the present case, they all owed the same duty to the patient").

To the extent that Dr. Decter's expert report is inconsistent or contradictory with respect to which physician prescribed the oral doses of amiodarone during Gurley's hospitalization at St. Luke's, the trial court was within its discretion to resolve any such inconsistencies. *See Albo v. Bahn*, No. 01-17-00409-CV, 2018 WL 2204295, at *4–5 (Tex. App.—Houston [1st Dist.] May 15, 2018, no pet.) (mem. op.) ("An expert report that contains inconsistent or contradictory statements, however, may still constitute a good-faith effort to comply with Chapter 74's expert report requirements.") (citing *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015)).[10]

---

[10] As noted above, Dr. Naeem argues that Dr. Decter's report is insufficient because he omits facts regarding Dr. Naeem's alleged treatment of Gurley, including whether Dr. Naeem's prescription was interrupted by another treating physician's prescription and, if so, when it was interrupted. Dr. Decter, however, states that Dr. Naeem prescribed the oral dose of amiodarone while Gurley was at St. Luke's and Dr. Samani prescribed the same dose of amiodarone to Gurley while he was at

**C. Dr. Viola's Opinion with Respect to CPS's Breach of the Applicable Standard of Care**

In his report, Dr. Viola opined that the standard of care required CPS to be knowledgeable about amiodarone, including its recommended uses, appropriate dosage, and side effects. Specifically, CPS should have known that amiodarone is indicated for the treatment of ventricular arrhythmias and should not be used as a first line agent to treat patients suffering from atrial fibrillation. He further states that even if it were customary to use amiodarone in an off-label fashion to treat chronic atrial fibrillation, CPS also should have known that the daily dosage should be no more than 200 mg/day and CPS should have recognized that Gurley's physicians at St. Luke's were overdosing him by prescribing 600 mg/day of amiodarone as a maintenance dose. Dr. Viola stated that CPS should have also known that "prolonged administration of Amiodarone in the overdosages that Dr. Decter describes in his expert report, as reflected in Mr. Gurley's hospital chart, were contrary to the proper usage and administration of Amiodarone and could lead to a number of adverse complications to Mr. Gurley, including the quadriplegia for which he was ultimately diagnosed." The overdoses that Dr. Viola is referring to, as described in Dr. Decter's report, are the overdose of intravenous amiodarone administered to Gurley beginning on August 16, 2016 (twelve grams, which is two grams above the

Vosswood, and he states that part of Gurley's stay at Vosswood occurred between Gurley's two hospitalizations at St. Luke's.

recommended dose) and the oral doses of 600 mg/day of amiodarone to Gurley on August 25, 2016 to September 9, 2016 and October 3, 2016 to October 7, 2016. Dr. Viola further opined that the standard of care required CPS to inform Gurley's physicians at St. Luke's that they were prescribing amiodarone in an off-label fashion as a "first line agent" for atrial fibrillation, which is contrary to the manufacturer's recommendations, and that they were ordering supratherapeutic dosages of amiodarone, which could lead to a number of adverse side effects, including quadriplegia.

According to Dr. Viola, Gurley's hospital chart indicates that he was never diagnosed with a ventricular arrhythmia. His hospital chart also "indicates that Mr. Gurley's treating physicians initially ordered Amiodarone as a first line agent [to treat a brief episode atrial fibrillation] and that other medications and therapies were not initially ordered and tried and proved to be unsuccessful prior to ordering Amiodarone for Mr. Gurley." He further states that Gurley's chart does not indicate that CPS ever warned Gurley's treating physicians that their orders were contrary to the manufacturer's recommendations or of the "potential long-term effects of continuing to prescribe and administer Amiodarone over a long period of time, as was the case when Mr. Gurley was hospitalized at CHI-St. Luke's Hospital prior to the ultimate diagnosis that he was suffering from Amiodarone toxicity."

CPS argues that Dr. Viola's opinions are deficient because they are based in part on his assumption that CPS was aware that Gurley was being prescribed amiodarone as a first line agent to treat atrial fibrillation. Dr. Viola, however, does not presume that CPS was aware of this information; rather, Dr. Viola opined that the standard of care required CPS to know what medical condition the amiodarone was being prescribed to treat, and what prior care therapy, if any, had been attempted or was contraindicated in Gurley's case. CPS contends that Dr. Viola's reports are deficient because he does not identify what constitutes a "prolonged" period for the administration of amiodarone or identify what an acceptable period would be. When considered as a whole, it is apparent that the "prolonged" period of over-medication that Dr. Viola refers to throughout his report is the time Gurley was hospitalized at St. Luke's.[11] At this stage of the proceeding, no more detail is required.

Considering Gurley's expert reports as a whole, we conclude that Dr. Viola has sufficiently informed CPS of what he believes it should have done differently in

---

[11] For example, Dr. Viola states that based on his review of Gurley's hospital chart, CPS's pharmacists never "advised and informed Dr. Shahzad and/or Dr. Naeem of the potential long-term effects of continuing to prescribe and administer Amiodarone over a long period of time, as was the case when Mr. Gurley was hospitalized at CHI-St. Luke's Hospital prior to the ultimate diagnosis that he was suffering from Amiodarone toxicity." He also refers to the "prolonged administration of Amiodarone in the overdosages that Dr. Decter describes in his expert report, as reflected in Mr. Gurley's hospital chart." In his original report, Dr. Viola stated that Gurley developed amiodarone toxicity that contributed to his quadriparesis, "[d]ue to the Amiodarone dose that [he] was given at CHI St. Luke's Hospital."

24

this case. Namely, CPS should have known that Gurley's physicians at St. Luke's were prescribing supratherapeutic dosages of amiodarone as a first line agent to treat Gurley's atrial fibrillation; CPS should have informed both physicians that their orders were contrary to the manufacturer's recommendations and that the administration of the drug, as prescribed, could lead to a number of adverse complications, including quadriplegia; and CPS should have recommended alternative medications.

To the extent that Gurley's expert reports are inconsistent or contradictory with respect to the applicable standard of care or breach or the facts underlying these opinions, the trial court was within its discretion to resolve any such inconsistencies. *See Albo*, 2018 WL 2204295, at *4–5 ("An expert report that contains inconsistent or contradictory statements, however, may still constitute a good-faith effort to comply with Chapter 74's expert report requirements.") (citing *Van Ness*, 461 S.W.3d at 144).

Similarly, to the extent that CPS is challenging the accuracy of these assertions, this issue should be raised in a motion for summary judgment, not a motion to dismiss under Chapter 74. *See Methodist Hosp. v. Shepherd–Sherman*, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Sanjar*, 252 S.W.3d at 467 n.6 and *Wissa v. Voosen*, 243 S.W.3d 165, 169–70 (Tex. App.—San Antonio 2007, pet. denied)); *see also Holt*, 2017 WL 3483211, at *3

(stating court's role is not to evaluate truth or falsity of facts upon which expert bases opinions expressed in Chapter 74 expert report) (citing *Mettauer*, 326 S.W.3d at 691).

After reviewing the reports in their entirety, we conclude that the trial court reasonably could have concluded that Gurley's expert reports represent a good-faith effort to inform CPS of the applicable standard of care and manner in which CPS allegedly breached that standard. *See Larson*, 197 S.W.3d at 304 (stating that when reviewing trial court decisions for abuse of discretion, "[c]lose calls must go to the trial court").[12]

**Causation**

Dr. Naeem argues that Dr. Decter's report is insufficient with regard to causation because the report fails to establish a causal link between Dr. Naeem's specific breach of the standard of care, as opposed to the conduct of the other doctors who also prescribed amiodarone, and Gurley's injury.

---

[12] CPS also argues that Viola's opinion that CPS was required to have policies and procedures in place and that CPS breached the standard of care by either violating those policies and procedures or not having the appropriate policies and procedures in place to begin with is speculative and conclusory because Viola admitted that he has not reviewed CPS's policies and procedures. Gurley argues that CPS waived this objection because CPS did not raise this challenge within 21 days of receiving the report. Because we have determined that the trial court could have concluded that the expert reports were sufficient with respect to a separate breach of the standard of care, we do not need to determine whether Dr. Viola's opinion on CPS's policies and procedures is also sufficient.

26

CPS argues that Dr. Viola is not qualified to opine on causation and that Dr. Decter's opinion on causation is deficient because it is conclusory and speculative.

## A. Applicable Law

To address causation, an expert report must explain how and why the physician's breach proximately caused the plaintiff's injury. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). The expert "must explain the basis of his statements and link conclusions to specific facts" and provide enough information from which the trial court could reasonably conclude that the claim has merit. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224, 226 (Tex. 2018). The explanation must be factual because "without factual explanations, the reports are nothing more than the ipse dixit of the experts, which . . . are clearly insufficient." *Zamarripa*, 526 S.W.3d at 461. An expert report is only required to provide notice of what conduct forms the basis for the plaintiff's complaints; it is not required to prove a defendant's liability at this early stage of the litigation. *Apodaca v. Russo*, 228 S.W.3d 252, 255 (Tex. App.—Austin 2007, no pet.).

Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Zamarripa*, 526 S.W.3d at 461. An expert "report need not use the words 'proximate cause,' 'foreseeability,' or 'cause in fact'" and its "adequacy does not depend on whether the expert uses any particular 'magical words.'" *Id.* at 460; *see also Wright*,

79 S.W.3d at 53 ("[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'").

A health care provider's breach is a foreseeable cause of the plaintiff's injury if a health care provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Curnel v. Hous. Methodist Hosp.–Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). "For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred." *Zamarripa*, 526 S.W.3d at 460. "[A] defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Bustamonte v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017).

## B. Causation — Dr. Naeem

Dr. Naeem argues that Dr. Decter's opinion on causation is insufficient because he aggregates Dr. Naeem's conduct with that of two other physicians who prescribed amiodarone to Gurley over a 109-day period and he does not identify the details of Dr. Naeem's prescription of amiodarone, such as when and whether the drug was "administered, stopped, or interrupted during the initial 27-day

28

hospitalization," and without that information, Dr. Decter cannot demonstrate that Dr. Naeem's specific conduct was a proximate cause of Gurley's axonal polyneuropathy.[13]

The opinion in *Hayes v. Carroll* is instructive. 314 S.W.3d 494 (Tex. App.— Austin 2010, no pet.). In *Hayes*, the plaintiff's expert opined that the doctors and nurses who examined the plaintiff failed to detect and document the presence of a bandage on the plaintiff's leg and to assess and monitor the condition of her bandaged leg. *Id.* at 506–07. The expert "opine[d] that each physician's and nurse's individual failure to notice the presence of the bandage and monitor the effect it had on [the plaintiff's] leg caused the bandage and its effects to go undetected, which caused the damage requiring amputation of her leg." *Id.* at 507. He reiterated that each defendant "is responsible for the harm caused by the constrictive bandage because none of them noticed, loosened, or removed it." *Id.*

As in this case, Hayes argued that the report was deficient because it collectively addressed causation and failed to link the expert's causation opinions to the conduct of each defendant. *Id.* at 506. In rejecting that argument, the court noted that the purpose of a Chapter 74 expert report is to demonstrate that a plaintiff's cause of action is not frivolous or without expert support and that such reports are

---

[13] Axonal polyneuropathy is a neurological disorder that occurs when many peripheral nerves throughout the body malfunction simultaneously.

only required to provide notice of what conduct forms the basis for the plaintiff's complaints, and not prove its case against or marshal all of its evidence. *Id.* at 507.[14]

In light of these considerations, the court held that the trial court did not abuse its discretion when it denied the defendants' motion to dismiss on the ground that the plaintiff's expert report was deficient as to causation. *Id.* at 508.

Here, Dr. Decter opines that Dr. Naeem prescribed Gurley a supratherapeutic dose of amiodarone (600 mg per day) that is three times the daily recommended amount during Gurley's hospitalization at St. Luke's,[15] that Gurley was administered

---

[14]    Citing to *Landers v. East Texas Salt Water Disposal Company*, Gurley argues that because his axonal polyneuropathy is an "indivisible injury" caused by the tortious conduct of Dr. Naeem, Dr. Shazhad, and Dr. Samani, collectively, he is not required to demonstrate that Dr. Naeem's breach, by itself, is a proximate cause of his injury in order to satisfy the requirements of Chapter 74. 151 Tex. 251, 248 S.W.2d 731, 734 (1952). Gurley's reliance upon *Landers* is misplaced. *Landers* held:

> Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit.

151 Tex. at 256, 248 S.W.2d at 734. An individual defendant, however, must first be liable for a plaintiff's injuries before the defendant can be held jointly and severally liable with another tortfeasor for the plaintiff's damages. We also note that we have not found—and Gurley has not directed us to—any opinions applying *Landers* or the "indivisible injury" theory in the context of Chapter 74 expert report proceedings.

[15]    Dr. Decter also states that Dr. Shazhad prescribed Gurley a supratherapeutic dose of amiodarone that is three times the daily recommended amount during Gurley's hospitalization at St. Luke's, in addition to the intravenous doses of amiodarone.

this dosage of amiodarone at St. Luke's from August 25, 2016 to September 9, 2016 and from October 3, 2016 to October 7, 2016, and that CPS dispensed the medication. He also notes that Gurley had received an intravenous supratherapeutic loading dose of twelve grams of amiodarone beginning on August 16, 2016, which is two more grams than customary.

Dr. Decter explains that amiodarone, which, stays in the body for a long time after the medicine has been administered (i.e., the drug has a long half life), has several known side effects including neurologic toxicity, which can manifest itself as ataxia and peripheral neuropathy with paresthesia (e.g., lack of muscle control or coordination, muscle weakness, and pain due to peripheral nerve damage). According to Dr. Decter, these side effects occur more frequently at higher doses. Dr. Decter contends that Gurley began experiencing several of these symptoms soon after he began receiving daily overdoses of amiodarone during his initial hospitalization at St. Luke's. Specifically, Dr. Decter states that Gurley was experiencing "pain, decrease in muscle strength, poor balance, coordination and activity tolerance, increased need of assistance and [an inability] to participate with ambulation" while at St. Luke's, which prompted his discharge to Vosswood for physical therapy on September 9, 2016, approximately two weeks after he began receiving overdoses of amiodarone on August 25. Thus, Dr. Decter has provided facts sufficient to demonstrate that a physician of ordinary intelligence would have

31

anticipated when he prescribed Gurley—a patient who had already been receiving supratherapeutic doses of amiodarone—three times the recommended dose of amiodarone that there was a danger that Gurley would develop axonal polyneuropathy, and that Gurley's nerve damage would not have occurred if not for Dr. Naeem's breach. *See Curnel*, 562 S.W.3d at 562.

## C.    Causation — CPS

CPS argues that Dr. Viola is not qualified to opine on the issue of medical causation and that Dr. Decter's opinions on the subject are deficient.

### 1.    Dr. Viola Qualifications

CPS contends that Dr. Viola is not qualified to opine on the issue of medical causation because he is a pharmacist, not a physician. This court addressed this issue in *Walgreen Co. v. Boyer*. In *Walgreens*, we observed that "Texas courts have uniformly interpreted [Chapter 74] as requiring a medical doctor to opine on causation in health care liability claims," and held that a pharmacist "is statutorily disqualified from providing an expert opinion on medical causation." *See Walgreen Co. v. Boyer*, No. 01-19-00093-CV, 2020 WL 1879552, at *3 (Tex. App.—Houston [1st Dist.] Apr. 16, 2020, no pet.) (mem. op.); *see also* TEX. CIV. PRAC. & REM. CODE §§ 74.351(r)(5)(c), 74.403(a). Because Viola is not qualified to opine on causation, we will not consider his opinions on the cause-in-fact or foreseeability components of the causation element and instead we will look exclusively to Dr. Decter's reports

to determine whether Gurley satisfied the Chapter 74's expert-report requirements regarding the element of causation. *See Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

### 2. Dr. Decter's Opinion with Respect to Causation

CPS argues that Dr. Decter did not establish that CPS's alleged breaches were a substantial factor in bringing about Gurley's alleged injuries because Dr. Decter did not explain in sufficient detail how amiodarone caused Gurley's quadriplegia. As previously discussed, Dr. Decter explained that amiodarone remains present in the body well after it is administered, and that the drug has several known side effects including neurologic toxicity, which occur more frequently at higher doses. According to Dr. Decter, neurologic toxicity can manifest itself as ataxia and peripheral neuropathy with paresthesia (e.g., lack of muscle control or coordination, muscle weakness, and pain due to peripheral nerve damage). Dr. Decter opined that Gurley received overdoses of amiodarone while he was hospitalized at St. Luke's and that he experienced many of manifestations of peripheral nerve damage before he was discharged to Vosswood for physical therapy in September 2016. According to Dr. Decter, the overdoses of amiodarone that Gurley received at St. Luke's (600 mg/day, which is three times the recommended dose) caused Gurley's nerve damage, a known side effect of the drug that is more likely to occur at higher doses. *Cf. Collini v. Pustejovsky*, 280 S.W.3d 456, 457 (Tex. App.—Fort Worth 2009, no

33

pet.) (holding that while facts in expert report "may create a reasonable inference that Dr. Collini's prolonged prescription of Reglan caused Pustejovsky's condition, we are not permitted to rely on that inference in reviewing Dr. Haberer's report"). In other words, Dr. Decter opined that the overdoses of amiodarone that CPS dispensed to Gurley while at St. Luke's led to an accumulation of the drug in Gurley's body that caused peripheral nerve damage that resulted in quadriplegia.

CPS also argues that Dr. Decter did not establish that CPS's alleged breaches were a substantial factor in bringing about Gurley's alleged injuries because Dr. Decter did not explain how CPS's questioning of Gurley's treating physicians' use of amiodarone would have resulted in the discontinuation of the medication. Dr. Decter and Dr. Viola, however, explained that a pharmacist's role is not merely to fill prescriptions; rather, a critical component of a pharmacist's job is to be knowledgeable about the medications he or she dispenses and to advise and warn physicians about the proper usage of the medications and the risks associated with them. Dr. Decter stated that Gurley's treating physicians at St. Luke's had not "adequately educated themselves and informed themselves about the potential adverse effects of amiodarone if it is prescribed in high dosages for a prolonged period of time, as was the care with Mr. Gurley." He further opined that if CPS had advised and warned these physicians that amiodarone should only be prescribed for atrial fibrillation patients when other agents or medications have failed or are

34

contraindicated, and only then, in the lowest dose possible to avoid adverse side effects, as Dr. Viola stated had they done what they were required to do under the applicable standard of care, the physicians "would have followed the standard of care and heeded both warnings and advice from CPS, and chosen a less toxic medication such as dronedarone." Thus, Dr. Decter explained how and why CPS's intervention in the manner described by him and by Dr. Viola would have persuaded Gurley's physicians at St. Luke's to prescribe Gurley something other than amiodarone.

CPS also argues that Dr. Decter's opinion on causation is conclusory because he attributes Gurley's injury to his "prolonged" exposure to amiodarone, i.e., his 98-day course of treatment, which included the amiodarone administered to him at Vosswood, and that there is no factual basis for Dr. Decter's opinion that CPS's conduct impacted the treatment provided to Gurley at Vosswood. This argument is unavailing. Dr. Decter opined that CPS dispensed the amiodarone administered to Gurley during both hospitalizations at St. Luke's and that all of the prescriptions for amiodarone that CPS filled exceeded the recommended dosage, including Gurley's oral doses of 600 mg/day, which were three times the recommended amount. Dr. Decter explained that overdoses of amiodarone have neurologic side effects, including nerve damage, and that Gurley was experiencing many manifestations of peripheral nerve damage before he was discharged to Vosswood for physical

35

therapy. He also opined that CPS's failure to warn Gurley's St. Luke's physicians led to Gurley's "continuing to be overdosed with amiodarone while hospitalized at CHI-St. Luke's Hospital, becoming amiodarone-toxic, and iatrogenically causing Mr. Gurley's quadriplegia." To the extent that there are inconsistencies or contradictory statements in Gurley's expert reports, the trial court was within its discretion to resolve any such inconsistencies. *See Albo*, 2018 WL 2204295, at *4–5. Furthermore, the fact that another pharmacy filled prescriptions for supratherapeutic doses of amiodarone that were administered to Gurley while he was as Vosswood and, therefore, may also be responsible for Gurley's injury, as CPS contends, does not mean that CPS's conduct could not be another substantial factor in bringing about Gurley's injury. *See Bustamonte*, 529 S.W.3d at 457 ("[A] defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury.")[16]

---

[16]     CPS argues that more detailed information was required to satisfy Chapter 74's requirements. The cases that CPS relies upon, however, are distinguishable and many of those cases involve more complicated factual scenarios than the one presented here, including the intermingling of medications and combined drug toxicity. *Cf. Kelly v. Ford*, 543 S.W.3d 383, 393-94 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (holding expert report insufficient because it did not explain how it was foreseeable that pharmacy's dispensation of compounded cream of ketamine and cyclobenzaprine caused patient's death because, among other things, expert did not identify amount of each drug in cream or amount of cream used by patient and noting that patient's death "might be foreseeable if . . . [pharmacy] dispensed [ketamine and cyclobenzaprine] in a dangerously high amount"); *Welch v. Christus Good Shepherd Med. Ctr.-Marshall*, No. 06-19-00089-CV, 2020 WL 1696086, at *1-2 (Tex. App.—Texarkana Apr. 8, 2020, no pet.) (mem. op.) (holding report insufficient with respect to causation because expert did

Considering the foregoing facts, we conclude that the trial court could have reasonably determined that the report represents a good-faith effort to link CPS's filling of Gurley's prescriptions for supratherapeutic doses of amiodarone while he was at St. Luke's to Gurley's injury—nerve damage.

In reaching our decisions with respect to the sufficiency of Gurley's reports on the element of causation, we are mindful that the expert report requirement is a low initial threshold intended to deter frivolous claims, not to dispose of claims regardless of their merit. *Scoresby*, 346 S.W.3d at 554; *see also Abshire*, 563 S.W.3d at 226 ("[W]ith respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings."). Gurley is not required to marshal all of his evidence or prove his case against Dr. Naeem, CPS, or any other defendant at this stage of the case. The statute only requires the plaintiff to serve a report that constitute a good-faith effort to provide a fair summary of the expert's opinions regarding causation. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). The good-faith effort requirement is met if the report

---

not state that "patient's conditions were known allergic reactions to Levaquin or that the administration of Levaquin was the cause-in-fact of the patient's medical conditions"); *Gingrich v. Scarborough*, No. 09–09–00211–CV, 2010 WL 1711067, at *2–3 (Tex. App.—Beaumont April 29, 2010, no pet.) (mem. op.) (holding expert report insufficient because "the report does not explain why combined drug toxicity occurred, how the combined drug toxicity related to the [cause of death], or why it was fatal").

provides enough information to (1) inform the defendant of the specific conduct the plaintiff calls into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879; *see generally Henry*, 375 S.W.3d at 535 (stating Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in favor of plaintiffs"). We are also mindful that when reviewing decisions, such as this one, that fall within the trial court's discretion, "[c]lose calls must go to the trial court." *Larson*, 197 S.W.3d at 304.

We overrule CPS's challenges to the sufficiency of Gurley's expert reports.

## Conclusion

Having concluded that the expert reports provide notice of the conduct forming the basis of Gurley's claims against CPS and Dr. Naeem, we affirm the trial court's orders denying CPS's and Dr. Naeem's respective motions to dismiss.


                                    Russell Lloyd
                                    Justice


Panel consists of Justices Keyes, Lloyd, and Landau.